### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| | Case No. 19-33395 (MI) |
| LEGACY RESERVES INC., *et al.*,[1] | (Jointly Administered) |
| Debtors. | **Ref Dkt. Nos. 342, 343, 344, 345, 346, 372, 373** |
| | **Hearing Date:  September 10, 2019 at 10:00 a.m. (CT)** |
| | **Objection Deadline:  September 5, 2019**[2] |

**OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED
CREDITORS TO DEBTORS' MOTION FOR ENTRY OF AN ORDER
(I) APPROVING THE ADEQUACY OF THE DISCLOSURE STATEMENT,
(II) APPROVING THE SOLICITATION AND VOTING PROCEDURES WITH
RESPECT TO CONFIRMATION OF THE PROPOSED JOINT CHAPTER 11
PLAN OF REORGANIZATION FOR LEGACY RESERVES INC. AND ITS
DEBTOR AFFILIATES, (III) APPROVING THE FORMS OF BALLOTS AND
NOTICES IN CONNECTION THEREWITH, (IV) APPROVING THE RIGHTS
OFFERING MATERIALS, (V) SCHEDULING CERTAIN DATES WITH
<u>RESPECT THERETO, AND (VI) GRANTING RELATED RELIEF</u>**

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are:  Legacy Reserves Inc. (9553); Legacy Reserves GP, LLC (1065); Legacy Reserves LP (1069); Legacy Reserves Finance Corporation (1181); Legacy Reserves Services LLC (2710); Legacy Reserves Operating LP (7259); Legacy Reserves Energy Services LLC (1233); Legacy Reserves Operating GP LLC (7209); Dew Gathering LLC (4482); Pinnacle Gas Treating (3711); Legacy Reserves Marketing LLC (7593). The location of the Debtors' service address is: 303 W. Wall St., Suite 1800, Midland, TX 79701.

[2]     Extended by the Court on August 21, 2019, *see* Courtroom Minutes, Docket No. 379.

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

PRELIMINARY STATEMENT ..........................................................................................................3

FACTUAL BACKGROUND ..........................................................................................................6

   I.   The Debtors' Chapter 11 Proceedings. ...........................................................................6

OBJECTION ..................................................................................................................................7

   I.   THE DISCLOSURE STATEMENT LACKS ADEQUATE INFORMATION. ............................7

      A.     Applicable Legal Standard. ..........................................................................7

      B.     The Valuation Analysis Fails To Provide Creditors With Adequate Information. .............9

         1.     Creditors' Perceived Bias Of PWP Will Cause  Creditors To Disregard Its Valuation Analysis.................................................................................................9

         2.     Plan Investors' Participation In Rights Offering At A Premium To Equity Value Renders The Valuation Analysis Unreliable ...................................................12

      C.     The Liquidation Analysis Fails To Provide Creditors With Adequate Information ........16

      D.     Other Adequate Information Deficiencies. ....................................................20

   II.   THE DISCLOSURE STATEMENT FAILS TO DESCRIBE A CONFIRMABLE PLAN. ..........20

      A.  The Plan Is Patently Unconfirmable Because It Cannot Satisfy Bankruptcy Code Section 1123(a)(4)....................................................................................................22

         i.     The Plan Confers Significant Economic Benefits To The Noteholder Backstop Parties ...22

         ii.     The Stockholders Agreement Confers Enhanced Rights To The Noteholder Backstop Parties....................................................................................................24

      B.  The Plan Is Patently Unconfirmable Because It Cannot Satisfy Bankruptcy Code Section 1129(a)(3)....................................................................................................25

   III.   THE VOTING AND SOLICITATION PROCEDURES AND RIGHTS OFFERING PROCEDURES SHOULD BE MODIFIED. ..............................................................27

   IV.   THE COURT SHOULD REQUIRE THE DEBTORS TO INCLUDE A COMMITTEE LETTER IN THE SOLICITATION MATERIALS.........................................................29

CONCLUSION..............................................................................................................................32

The Official Committee of Unsecured Creditors (the "**Committee**"), duly appointed in the Chapter 11 cases of Legacy Reserves Inc. and its affiliated debtors and debtors-in-possession (collectively, the "**Debtors**"), submits this objection (the "**Objection**") to the *Debtors' Motion for Entry of an Order (I) Approving the Adequacy of the Disclosure Statement, (II) Approving the Solicitation and Voting Procedures With Respect to Confirmation of the Proposed Joint Chapter 11 Plan of Reorganization For Legacy Reserves Inc. and its Debtor Affiliates, (III) Approving the Forms of Ballots and Notices in Connection Therewith, (IV) Approving the Rights Offering Materials, (V) Scheduling Certain Dates with Respect Thereto, and (VI) Granting Related Relief* [Docket No. 344] (the "**Disclosure Statement Motion**").[3]  In support if this Objection, the Committee respectfully states as follows:

## PRELIMINARY STATEMENT

1.      The Disclosure Statement leads off by listing all those creditor constituencies that are supporting the Plan and have executed the Global RSA:  the "Required Holders under the RBL Credit Agreement, 100% of the Holders under the Term Loan Credit Agreement, and Holders of approximately 60% of the Senior Notes."[4]  *See* Disclosure Statement at 1.  All of these parties were "locked up" before the commencement of these Chapter 11 Cases.  They are not the Debtors intended audience.  Rather, the Disclosure Statement is targeted to the holders of approximately 45% of the Senior Notes that are not Noteholder Backstop Parties.  For them, the Disclosure Statement woefully lacks the adequate information required by Bankruptcy Code section 1125.

---

3       Capitalized terms used in this Objection but not otherwise defined shall have the meaning ascribed to them in the Disclosure Statement Motion or the *Joint Chapter 11 Plan Of Reorganization For Legacy Reserves Inc. And Its Debtor Affiliates* [Docket No. 372] (the "**Plan**") and the *Disclosure Statement for the Joint Chapter 11 Plan of Reorganization for Legacy Reserves Inc. and Its Debtor Affiliates* [Docket No. 373] (the "**Disclosure Statement**")

4       The actual percentage of outstanding Senior Notes subject to the Global RSA is closer to 55%.

2.     From an adequate information standpoint, a key piece of information Class 5 Notes Claims Holders need to intelligently vote to accept or reject the Plan or to participate in the Rights Offering (if eligible) is a credible valuation of the Debtors.   Unfortunately, the Valuation Analysis fails to provide creditors with adequate information to make such decisions.

3.     First, the Debtors' proposed investment banker, Perella Weinberg Partners LP ("**PWP**"), prepared the Valuation Analysis.  Following an objection raised by the Committee to PWP's proposed retention and an initial hearing on PWP's retention over a month ago, its retention remains unresolved.  The Committee's objection principally related to PWP's disclosed connections to the Plan Sponsors and potentially disabling conflicts.   Additionally, PWP previously prepared a valuation of the Debtors on behalf of certain of the Noteholder Backstop Parties.  These connections with parties who stand to benefit significantly from consummation of the Plan raise issues of perceived bias that render the Valuation Analysis unreliable by Holders of Class 5 Notes Claims.

4.     Secondly, the Valuation Analysis – in a foolhardy attempt to undervalue the Debtors to demonstrate that Class 5 Notes Claims are "out of the money" – implies that the Plan Sponsor Parties and the Noteholder Backstop Parties are investing in the Debtors at a significant premium to the Valuation Analysis' implied equity value.   In the history of recently consummated rights offerings in the context of Chapter 11 cases, this is utterly implausible and reflects the deficiencies inherent with the Valuation Analysis prepared by PWP.  It is also wildly inconsistent with the valuation opinion negotiated by the Debtors and the Plan Sponsors in connection with execution of the Initial RSA which is more than $100 million greater than the Valuation Analysis' midpoint value.  Further, prior to the Petition Date, the Plan Sponsors and the Ad Hoc Group were negotiating allocations of the reorganized Debtors' equity based upon

significantly higher Plan valuations.  Several of the term sheets exchanged by the parties implied Plan total enterprise values in excess of $1 billion.  PWP, in conjunction with such negotiations, proposed a rights offering "struck at" over $1 billion.

5.     For these reasons, Holders of Class 5 Notes Claims may not rely upon the Valuation Analysis to make an informed decision on the Plan.  This deficiency alone is a sufficient basis to deny approval of the adequacy of the Disclosure Statement.

6.     To make matters worse, though, the Debtors' artificial suppression of value extends to the Liquidation Analysis.  The Liquidation Analysis is intended to demonstrate compliance with the "best interests test" under Bankruptcy Code section 1129(a)(7) and inform Holders of Class 5 Notes Claims that their projected recovery under the Plan is greater than or equal to what they might receive under a Chapter 7 liquidation.  However, the Liquidation Analysis disregards the fact that a significant amount of the Debtors' reserves acreage and producing wells are unencumbered by the Debtors' secured lenders' liens in determining potential recoveries to Class 5 Notes Claims in a Chapter 7 liquidation.  The Liquidation Analysis also ascribes values to the Debtors' reserve acreage without taking into account the bids the Debtors' received for their assets prior to the commencement of these Chapter 11 cases. It also implausibly suggests that the RBL Lenders – who are prepared to provide $500 million of Exit Financing to the Debtors – will need to carry the Exit Financing on their books as a questionable loan given the risk of loss on the loan if the Debtors default on the Exit Financing. These deficiencies limit the utility of the Liquidation Analysis for Holders of Class 5 Notes Claims and this Court alike.  As such, the Disclosure Statement is unapprovable in its current form.

7.      Additionally, as identified on Exhibit A attached hereto, the Disclosure Statement contains a number of other inaccuracies, incomplete statements of fact, or otherwise misleading information that should be addressed by the Debtors before the Court considers the Disclosure Statement.

8.      The Plan also suffers from a number of defects which render it unconfirmable in its current form.  Specifically, as discussed in-depth in Part II, below, the Plan fails to comply with Bankruptcy Code section 1123(a)(4) which requires all Class 5 Notes Claims to be treated similarly under the Plan and Bankruptcy Code section 1129(a)(3) which requires the Plan to be proposed in good faith and not for any illicit purpose.  It is incontrovertible that the Class 5 Notes Claims held by the Plan Sponsors and Noteholder Backstop Parties are receiving more favorable treatment than the Class 5 Notes Claims held by non-Noteholder Backstop Parties. Further, the artificially low valuation set forth in the Valuation Analysis illicitly substantiates the Plan Sponsor's ability to take substantial tax losses or reduce potentially taxable gain on account of their Class 4 Term Loan Claims in violation of Bankruptcy Code section 1129(a)(3).

9.      Finally, if the Court determines to approve the Disclosure Statement, the Committee requests discrete modifications to the proposed Rights Offering Procedures and Voting and Solicitation Procedures, including the proposed timeline for the Court's consideration of confirmation of the Plan.

## FACTUAL BACKGROUND

I.   **The Debtors' Chapter 11 Proceedings.**

10.      On June 18, 2019 (the "**Petition Date**"), each of the Debtors filed voluntary petitions under Chapter 11 of the Bankruptcy Code.  Since the Petition Date, the Debtors have continued to operate and manage their businesses as debtors-in-possession pursuant to Bankruptcy Code Sections 1107(a) and 1108.

11.     On July 3, 2019, the Office of the United States Trustee appointed the Committee. *See Notice of Appointment of Committee of Unsecured Creditors* [Docket No. 179].   The Committee's membership presently consists of:  (i) Wilmington Trust, National Association, in its capacity as indenture trustee for the Senior Notes; (ii) Dalton Investments, LLC; (iii) John M. Dinkel; and (iv) Nicholas Mumford.

12.     On August 2, 2019, the Debtors filed the *Joint Chapter 11 Plan Of Reorganization For Legacy  Reserves Inc. And Its Debtor Affiliates* [Docket No. 342] and the *Disclosure Statement for the Joint Chapter 11 Plan of Reorganization for Legacy Reserves Inc. and Its Debtor Affiliates* [Docket No. 343]. On August 18, 2019, the Debtors filed the revised Plan and Disclosure Statement to include, amongst other things, the Valuation Analysis, Liquidation Analysis and Financial Projections.

## OBJECTION

## I.    THE DISCLOSURE STATEMENT LACKS ADEQUATE INFORMATION.

### A.  Applicable Legal Standard.

13.     Bankruptcy Code section 1125(b) states that a disclosure statement must contain "adequate information" regarding a proposed plan to holders of impaired claims and interests entitled to vote on such plan. 11 U.S.C. § 1125(b). "Adequate information" means "information of a kind, and in sufficient details, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records . . . that would enable . . . a hypothetical investor of the relevant class to make an informed judgment about the plan." 11 U.S.C. § 1125(a)(1); *In re Texas Extrusion Corp.*, 844 F.2d 1142 (5th Cir.), *cert. denied*, 488 U.S. 926 (1988), *In re Divine  Ripe, L.L.C.*, 554 B.R. 395, 401-02 (Bankr. S.D. Tex. 2016). The Bankruptcy Code requires that a debtor "adequately, not selectively, disclose fully and precisely all information a creditor would reasonably want before voting on the plan." *Westland Oil Dev.*

*Corp. v. MCorp. Mgmt. Solutions, Inc. v. Fed. Deposit Ins. Corp. (In re Westland Oil)*, 157 B.R. 100, 104 (S.D. Tex. 1993).

14.     Courts consider numerous factors when determining the sufficiency of the information in a disclosure statement, including, but not limited to, "financial information, data, valuations or projections relevant to the creditors' decision to accept or reject the Chapter 11 plan." *Divine Ripe*, 554 B.R. at 401-02 (listing nineteen non-exhaustive factors set forth in *In re Metrocraft Pub. Servs., Inc.,* 39 B.R. 567, 568 (Bankr. N.D.Ga. 1984));[5] *see also In re Cypresswood Land Partners, I*, 409 B.R. 396, 424 (Bankr. S.D. Tex. 2009) (applying the *Metrocraft* standard to determine adequacy of disclosure statement).

15.     Whether a disclosure statement contains "adequate information" should be assessed from the perspective of the claims or interest holders with the ability to vote. *See In re Phoenix Petroleum Co.*, 278 B.R. 385, 393 (Bankr. E.D. Pa. 2001) (citing *In re Monroe Well Serv., Inc.*, 80 B.R. 324, 330 (Bankr. E.D. Pa. 1987)).

16.     Here, the Disclosure Statement fails to provide sufficient information necessary for impaired Holders of Class 5 Notes Claims to make an informed decision when voting on the Plan or considering participation in the Rights Offering.   In its current form, the Disclosure

---

[5]     The factors that can inform whether a disclosure statement provides "adequate information" include: (1) the events which led to the filing of a bankruptcy petition; (2) a description of the available assets and their value; (3) the anticipated future of the company; (4) the source of information stated in the disclosure statement; (5) a disclaimer; (6) the present condition of the debtor while in Chapter 11; (7) the scheduled claims; (8) the estimated return to creditors under a Chapter 7 liquidation; (9) the accounting method utilized to produce financial information and the name of the accountants responsible for such information; (10) the future management of the debtor; (11) the Chapter 11 plan or a summary thereof; (12) the estimated administrative expenses, including attorneys' and accountants' fees; (13) the collectability of accounts receivable; (14) financial information, data, valuations or projections relevant to the creditors' decision to accept or reject the Chapter 11 plan; (15) information relevant to the risks posed to creditors under the plan; (16) the actual or projected realizable value from recovery of preferential or otherwise voidable transfers; (17) litigation likely to arise in a non-bankruptcy context; (18) tax attributes of the debtor; and (19) the relationship of the debtor with the affiliates. *Divine Ripe*, 554 B.R. at 401-02.

Statement is both facially and substantively deficient with respect to critical plan-related issues, and thus fails to satisfy the basic disclosure requirements of Bankruptcy Code section 1125(a).

### B.  The Valuation Analysis Fails To Provide Creditors With Adequate Information.

17.    The Debtors attempt to comply with the disclosure requirements to provide parties in interest with a valuation of the Debtors' business through inclusion of a valuation analysis prepared by the Debtors' proposed investment banker, Perella Weinberg Partners LP ("**PWP**").  *See* Valuation Analysis (attached as Exhibit F to Disclosure Statement).  Following a sparse description of the valuation methodologies PWP employed to conduct its valuation, PWP arrived at an "estimated range of the Enterprise Value of the Reorganized Debtors of between $725 million and $925 million, with a midpoint estimate of approximately $825 million" Valuation Analysis at 3.  At PWP's mid-point enterprise valuation of $825 million, holders of Class 5 Notes Claims are projected to recover 2.5% on account of such claims in the form of New Common Stock (excluding any stock received on account of the Rights Offering).

### 1.    Creditors' Perceived Bias Of PWP Will Cause Creditors To Disregard Its Valuation Analysis

18.    PWP describes itself as "investment banker to the Debtors" but, in reality, PWP is only the Debtors' proposed investment banker.  Valuation Analysis at 1.  PWP's retention remains pending due to the Committee's objection to PWP's retention.  However, the Disclosure Statement fails to provide parties in interest with any of the details behind the Committee's objection to PWP's retention, including the Debtors' inability to retain PWP due to potentially disabling conflicts because of its connections with the Plan Sponsors, to enable creditors to evaluate any bias in PWP's preparation of the Valuation Analysis.  The Disclosure Statement even neglects to mention that PWP previously performed a valuation analysis of the Debtors

when engaged by certain of the Noteholder Backstop Parties.[6]  This valuation on behalf of certain of the Noteholder Backstop Parties, although undisclosed to the Committee, is virtually guaranteed to be greater than the enterprise values reflected in the Valuation Analysis given the negotiation posture of such Noteholder Backstop Parties at the time.  It likely also will demonstrate that PWP's valuation work is unreliable because it is tailored to any given constituency at any given time.  Once the Debtors provide such information, creditors are likely to wholesale disregard the Valuation Analysis.  This effectively denies creditors the adequate information they need to evaluate the Plan.

19.     The Court has noted on multiple occasions that it holds PWP and one of its principals, Mr. Kevin Cofsky, in high regard and is prepared to allow PWP to testify on issues regarding valuation.  In fact, the Court previously allowed Mr. Cofsky to testify at the hearing to consider approval of payment of certain exit fees and the fees of the Ad Hoc Group of Senior Noteholders (the "**Ad Hoc Group**").  The Court has also invited the Committee to challenge PWP's Valuation Analysis at confirmation based upon, among other things, any potential bias in the preparation of the Valuation Analysis.  The Committee has no doubt that the Court will competently consider any connections PWP has to GSO and other Noteholder Backstop Parties in determining how much weight to give PWP's testimony at any hearing on confirmation of the Debtors' Chapter 11 Plan.  However, for purposes of assessing adequate disclosure, especially given the intended audience of the Disclosure Statement (*i.e.*, retail holders of the Class 5 Notes Claims) and the Committee's demand that the Debtors elaborate on the circumstances of PWP's

---

[6] PWP did not previously disclose its preparation of a valuation analysis on behalf of certain of the Noteholder Backstop Parties to the Court or the Committee and was first mentioned by Mr. Cofsky during his examination by the Committee on September 4, 2019.  The extent of the disclosure by PWP with respect to the work on behalf of certain of the Noteholder Backstop Parties is contained in the *Amended And Restated Declaration of Kevin M. Cofsky in Support of Debtors' Application for Entry of an Order Authorizing the Retention and Employment of Perella Weinberg Partners LP as Financial Advisor for the Debtors and Debtors in Possession, Nunc Pro Tunc to the Petition Date* [Dkt No. 293].  There, Mr. Kevin Cofsky only disclosed that PWP prepared a "written assessment of the Debtors' business and assets."

pending retention, issues regarding PWP's retention should be resolved prior to inclusion of its Valuation Analysis in the Disclosure Statement.

20.     Notwithstanding the issues surrounding PWP's retention, the Disclosure Statement provides only a chronology of the Debtors' filing of PWP's retention application (the "**PWP Retention Application**") and the Committee's filing of an objection to the PWP Retention Application (the "**PWP Retention Objection**"), and the adjournment of the Court's consideration of the PWP Retention Application "for further determination."  Disclosure Statement at 24.  The details of the PWP Retention Objection and the Court's consideration of the PWP Retention Application and PWP Retention Objection are critical to enabling creditors to evaluate the reliability of the Valuation Analysis, and any potential bias in its preparation, while PWP's retention is pending.  Specifically, the Disclosure Statement should reference PWP's engagement by the Plan Sponsors on another matter while negotiations were ongoing on the terms of the Debtors' restructuring and PWP's historical investment in funds managed by or affiliated with the Plan Sponsors.

21.     Pursuant to the PWP Retention Objection, the Committee objected to the Debtors' proposed retention of PWP due to insufficient disclosure by PWP to enable the Committee (or the Court) to conclude that PWP does not hold or represent an "adverse interest" to the Debtors' estates and is "disinterested" as required by Bankruptcy Code section 327(a).  In addition, the Committee objected to PWP's proposed retention on the basis that it was not on "reasonable terms" as required by Bankruptcy Code section 328(a).  At the July 31, 2019 hearing on the PWP Retention Application (the "**PWP Retention Hearing**"), the Committee elicited testimony concerning PWP's troublesome disclosures, including its disclosure that certain funds managed by PWP hold investments in GSO Capital Partners, LP.

22.     In response to issues raised by the Committee regarding PWP's potential lack of disinterestedness, the Court considered the former issue exclusively.  *See* August 1, 2019 Hearing Transcript at 54:3-7 (Court stating "I'd like to go initially to whether they can be retained before I get to what they can be paid.")  Following lengthy testimony by Mr. Cofsky on cross examination by the Committee on disinterestedness related issues, the Court adjourned the PWP Retention Hearing to provide PWP with an opportunity to provide additional disclosures in support of its disinterestedness.  To date, despite the passage of over a month since the PWP Retention Hearing, PWP's retention is unresolved.  Nevertheless, the Debtors charged PWP with preparation of the Valuation Analysis notwithstanding PWP's potentially disabling conflicts and incomplete disclosures of connections with GSO.

23.     None of the highly relevant facts and circumstances related to PWP's proposed retention are included in the Disclosure Statement or the Valuation Analysis.  Further, the Committee's objection cannot be resolved by merely including more disclosure.  Inclusion of such disclosure would lead parties in interest reviewing the Disclosure Statement to unquestionably disregard the Valuation Analysis as inherently unreliable or biased and therefore deny them the very information they need to form an opinion on the Plan and participation in the rights offering.  For this reason, the Disclosure Statement cannot be found to contain adequate information while a cloud remains over PWP's retention.

### 2.        Plan Investors' Participation In Rights Offering At A Premium To Equity Value Renders The Valuation Analysis Unreliable

24.     As noted above, the Debtors' inclusion of PWP's Valuation Analysis is intended to satisfy the requirement that the Disclosure Statement contain adequate information to allow creditors to arrive at an informed opinion on acceptance or rejection of the Plan and, to the extent eligible, participation in the Rights Offering.  The Committee is in the process of reviewing the

Valuation Analysis and may very well reach a conclusion that the Valuation Analysis reflects an artificially low valuation for the Debtors.

25.     Putting aside the Committee's views, sophisticated investors, including the Plan Sponsor Backstop Parties (*i.e.*, funds affiliated with or managed by GSO Capital Partners LP) and the Noteholder Backstop Parties (*i.e.*,  the members of the Ad Hoc Group which include funds affiliated with or managed by sophisticated asset managers including Canyon Capital Advisors, Doubleline Capital LP and Goff Capital) clearly do not put much stock in the Valuation Analysis.  Together, the Plan Sponsor Backstop Parties and the Noteholder Backstop Parties (together, the "**Plan Investors**") are prepared to invest up to $256.3 million in the Debtors.

26.     Despite the Committee's skepticism that the Global RSA fairly distributes value to holders of all Class 5 Notes Claims and request for more time to complete discovery in advance of the Court's hearing to consider the approval of the Disclosure Statement (which would allow them to escape their obligations to fund the Plan if they exercised termination rights under the Global RSA and its ancillary documents), the Plan Sponsor Backstop Parties and the Noteholder Backstop Parties continue to press vigorously for implementation of their restructuring plan on their timetable.    Yet, as reflected in the chart below,[7] the Valuation Analysis suggests that their investment in the Debtors would be an unwise, money-losing investment, requiring GSO to invest in the Debtors at a **24% premium to the Plan's midpoint implied equity value** and the Noteholder Backstop Parties at nearly a **10% premium to the Plan's midpoint implied equity value**.  Non-Noteholder Backstop Parties, who do not have the

---

[7]  The equity received per the chart below includes all economics of Rights Offering (*i.e.*, Backstop Fee and Participation Premium) and assumes that no non-Noteholder Backstop Parties participate in the Rights Offering.

benefit of the Backstop Fee, would participate at an even greater premium to the Plan's midpoint implied equity value.

| PWP Valuation - Equity Value | | | |
|---|---|---|---|
| | Low | Mid | High |
| Enterprise Value | $725 | $825 | $925 |
| Less: Post Emergence Net Debt | (360) | (360) | (360) |
| **Equity Value - PWP** | **$365** | **$465** | **$565** |

| Equity Value Variance - PWP Valuation vs. 2L Backstop Commitment | | | |
|---|---|---|---|
| | Low | Mid | High |
| 2L Backstop Commitment Amount | $190 | $190 | $190 |
| Equity Received | 33.0% | 33.0% | 33.0% |
| **Implied Equity Value - 2L Backstop Commitment** | **$575** | **$575** | **$575** |
| Equity Value - PWP | 365 | 465 | 565 |
| *Equity Value Variance (PWP - 2L Backstop Com.)* | *($210)* | *($110)* | *($10)* |
| *Implied Premium / (Discount)* | *57.5%* | *23.6%* | *1.7%* |

| Equity Value Variance - PWP Valuation vs. Implied Rights Offering (GSO & Backstop Parties) | | | |
|---|---|---|---|
| | Low | Mid | High |
| Rights Offering Amount | $67 | $67 | $67 |
| Equity Received | 13.1% | 13.1% | 13.1% |
| **Implied Equity Value - R.O.** | **$509** | **$509** | **$509** |
| Equity Value - PWP | 365 | 465 | 565 |
| *Equity Value Variance (PWP - R.O.)* | *($144)* | *($44)* | *$56* |
| *Implied Premium / (Discount)* | *39.4%* | *9.4%* | *-9.9%* |

27.     As set forth in a recent "Restructuring Data Report" prepared by Debtwire, "[i]nvestors are generally incentivized to put in new money through a rights offering because they are able to purchase equity in the reorganized company at a discount to the valuation used in the company's Chapter 11 plan." *See* Rights Offerings: Oil & Gas, Restructuring Data Report (July 17, 2019) at 11 (attached as **Exhibit B** hereto) (the "**Rights Offering Research**"). Between the first quarter of 2016 and the second quarter of 2019, the period covered by the Rights Offering Research, Debtwire identified 17 Chapter 11 cases which included a rights offering. None of these cases offered the rights offering at a premium to plan value. The premium to plan value implied by the Valuation Analysis is unprecedented.

28.     In negotiating the Global RSA, none of the parties envisioned paying a premium to plan value.  Even the Initial RSA contemplates a total enterprise valuation of the Debtors of $950 million for purposes of determining the offering price of the Rights Offering thereunder. *See* Exhibit A-2 to First Amended and Restated Restructuring Support and Lock-Up Agreement (attached to First Day Declaration as Exhibit B) [Docket No. 2].  Further, prior to the Petition Date, the Plan Sponsors and the Ad Hoc Group were negotiating allocations of the reorganized Debtors' equity based upon significantly higher Plan valuations.  Several of the term sheets exchanged by the parties implied Plan total enterprise values in excess of $1 billion.  PWP, in conjunction with such negotiations, proposed a Rights Offering "struck at" over $1 billion.  As such, the Valuation Analysis reflects an improper, artificial attempt by PWP, the Debtors and the Plan Sponsor to devalue the Debtors.

29.     Sometimes, the emperor has no clothes.  This is such a case.  Sophisticated Wall Street investors do not invest new money at a significant premium to equity value unless they expect a huge return.  That is the case here and is the classic "National Gypsum" play.  The Plan Sponsors and the Debtors have depressed the Debtors' value in order to take advantage of the large value "pop" in value to come after the Debtors have shortchanged the minority Class 5 Notes Claims Holders and the Plan Sponsors have taken control of the reorganized Debtors.

30.     For these reasons, no holder of a Class 5 Note Claim can rely on the Valuation Analysis to reach any conclusion on whether the Plan offers fair value on account of Class 5 Notes Claims and no Qualified Noteholder would consider participating in the Rights Offering based upon the Valuation Analysis.  It is clear that the Valuation Analysis is so clearly fundamentally flawed such that the Disclosure Statement fails to contain adequate information regarding the Debtors' valuation.

### C.  The Liquidation Analysis Fails To Provide Creditors With Adequate Information

31.     On August 18, 2019, the Debtors filed the Liquidation Analysis with the Court. The purpose of the Liquidation Analysis is to demonstrate that the "Plan satisfies the requirements of section 1129(a)(7) of the Bankruptcy Code, also referred to as the 'best interests of creditors' test."  See Liquidation Analysis at 1.  The conclusion reached by the Liquidation Analysis is that "upon the Effective Date the Plan will provide all creditors . . . with a recovery (if any) that is not less than what they would otherwise receive pursuant to a liquidation of the Debtors under Chapter 7 of the Bankruptcy Code."  *See* Liquidation Analysis at 3.  The Committee is in the process of verifying the conclusions reached by the Liquidation Analysis. While doing so, however, the Committee has identified a number of issues which call into doubt the credibility of the Liquidation Analysis.

32.     The primary driver of creditors' recoveries in a liquidation of the Debtors is the value received on account of the Debtors' oil and gas properties.  The Liquidation Analysis assumes that the "Trustee sells or otherwise monetizes the reserves and associated equipment owned by the Debtors, in logical regional or geological packages, or on a piecemeal basis, with sales to buyers during a six-month wind-down period."  See Liquidation Analysis at 6.  The Liquidation Analysis then goes on to conclude that the sale of the Debtors' assets through the liquidation on a "compressed timeframe" will result in "less than 'fair value' for the assets" only netting between "33% and 44% of net book value" (i.e., between $425 million and $570 million) for the Debtors' oil and gas reserves.  *See* Liquidation Analysis at 6.  Based on this valuation, the Debtors assert that their RBL is underwater with only a 67.6% recovery on the $313 million non-refinanced portion of the Debtors' prepetition RBL debt based on the mid-point liquidation value

of the Debtors' assets.  The Liquidation Analysis further posits that the holders of the second lien term loan debt will not receive any recovery in a Chapter 7 liquidation.

33.     This valuation stands in stark contrast to the PV-10 reserve report values (the "**PV-10 Values**") prepared by PWP and Tudor Pickering Holt & Co. on behalf of the Debtors, and published shortly before commencement of these Chapter 11 cases, of between $876 million and $1.3 billion the Debtors. See Legacy Reserves Overview, June 2019 (attached as Exhibit 99.2 to Form 8-K filed by Debtors on June 14, 2019).  The PV-10 Values for the Debtors' "proved developed producing" ("**PDP**") reserves alone was reported between $735 million and $763 million.  The Liquidation Analysis suggests that all of the Debtors' reserves, inclusive of their PDP reserves and undeveloped acreage, would sell at a 38% discount to the PV-10 value for just the PDP Reserves.  The Liquidation Analysis provides no justification for such a dramatic discount from PV-10 Values.

34.     It is also difficult to reconcile the Liquidation Analysis' range of values with the results of the Debtors' prepetition strategic review.  The Disclosure Statement notes that on "March 13, 2019, the Company publicly announced that it was exploring potential strategic alternatives" which included a sale of its assets.  *See* Disclosure Statement at 22.  Although announced earlier, the strategic process was launched on March 26, 2019 and set an Initial Bid Deadline of 38 days later (i.e., May 3, 2019).  By the Debtors' own admission, this abbreviated sub-two months' long prepetition sale was doomed to fail.  After all, the six months' long postpetition orderly liquidation sales process upon which the Liquidation Analysis is premised is considered a "compressed timeframe" and would fail to realize "fair value" for the Debtors' assets due to, among other things, the short time period over which the sales are projected to

occur.  Accordingly, far from being a process designed to discover the market value of the Debtors' assets, the 38 day prepetition sales process conducted by PWP was woefully deficient.

35.    Nevertheless, the process did generate eight Proposals.  Combined, the Proposals to acquire the Debtors' assets represented bids in excess of the Liquidation Analysis' high range for the Debtors' oil and gas properties.  In addition, the Proposal to refinance the RBL with advances of $600 million assumed a 75% loan-to-value.  The Liquidation Analysis' failure to consider the Proposals in developing the liquidating values of the Debtors' assets renders it defective and unreliable.

36.    Additionally, the Debtors' own proposed Exit Financing cuts against the liquidation values ascribed in the Liquidation Analysis.  As set forth in the Exit Facility Term Sheet, the Initial Borrowing Base for the RBL Exit Facility "shall be $500 million" and ratchets down to $470 million by June 1, 2020.  *See* Exit Facility Term Sheet at 5.   The Exit Facility Term Sheet contemplates that the full $500 million of Maximum Revolving Commitments will be available to the Debtors as of the Plan Effective Date.  See Exit Facility Term Sheet at 4. Furthermore, the Exit Facility Term Sheet required that the "Borrower shall have conducted a refinancing process for the obligations under the Existing Credit Agreement."  See Annex A to Exit Facility Term Sheet at 3.  As a consequence of undertaking the refinancing process, the Disclosure Statement discloses that "[t]he Debtors are engaged in active discussions with potential agents for [] an Alternative Exit Facility."  See Disclosure Statement at 3.

37.    The willingness of the existing RBL Lenders to provide the RBL Exit Facility (putting aside the fact they actually increased their exposure by $100 million through advancing the new money DIP Loans during the Chapter 11 Cases) and the third party interest developed by the Debtors in providing an Alternative Exit Facility demonstrates that liquidation value of the

Debtors' reserves are well in excess of the amount projected by the Liquidation Analysis.  It would be highly unusual for reserve based lenders, especially given the degree of distress among oil and gas producers, to lend an amount equal to or less than the liquidation value of their collateral.  It is more typical that such lenders require a significant collateral cushion for regulatory reasons, including compliance with guidance issued by the Office of the Comptroller of the Currency (the "**OCC**").

38.     The OCC issued guidance in March 2016 regarding, among other things, risk rating upstream exploration and production companies.  See Comptroller's Handbook - Oil and Gas Exploration and Production Lending (Version 2.0, March 2016) (the "**OCC Guidelines**").  Within the document, the OCC states "[t]he value of the reserves helps determine the loan amount and dictates the availability of funds" and "[t]he maximum advance rates against the total risk-adjusted NPV of the proved reserves typically range between 50 percent and 65 percent." See OCC Guidelines at 24.

39.     The Liquidation Analysis' assumed gross liquidation proceeds for the Debtors' oil and gas properties, ranging between $425 million and $570 million, is substantially below the $769 million to $1,000 million in collateral value banks require to support a $500 million borrowing base.  Further, the RBL Exit Lenders' willingness to stipulate to modest reductions in the Borrowing Base through June 2020 reflects confidence in the liquidation value of the Debtors' reserves.  It is highly unlikely that the anticipated RBL Lenders would lend into a situation which requires special classification of the debt or risk significant exposure to the losses projected by the Liquidation Analysis.   Thus, it is far more likely that the Liquidation Analysis is flawed and is unreliable.

**D.  Other Adequate Information Deficiencies.**

40.     The Disclosure Statement contains a number of other inaccuracies, incomplete statements of fact, or otherwise misleading information. The Disclosure Statement must be amended to cure such deficiencies. These include, among others, the deficiencies identified on **Exhibit A** attached hereto.

41.     In sum, the Disclosure Statement fails to provide adequate information under Bankruptcy Code section 1125 because it contains inaccuracies and omits critical information. Without a reliable Valuation Analysis, Liquidation Analysis and the other information, creditors cannot fairly assess whether to accept or reject the Plan. The Disclosure Statement cannot be approved as it is. *See Divine Ripe*, 554 B.R. at 413 (finding that a disclosure statement could not be approved because it could not meet multiple *Metrocraft* factors and, "as such, creditors would be hard pressed to determine whether to vote in favor of the Debtor's Plan").

## II.   THE DISCLOSURE STATEMENT FAILS TO DESCRIBE A CONFIRMABLE PLAN.

42.     Ordinarily, confirmation issues are reserved for the confirmation hearing, and not addressed at the disclosure statement hearing. *In re Am. Capital Equip., LLC*, 688 F.3d 145, 153 (3d Cir. 2012)  ("Courts have recognized that if it appears there is a defect that makes a plan inherently or patently unconfirmable, the Court may consider and resolve that issue at the disclosure stage before requiring the parties to proceed with solicitation of acceptances and rejections and a contested confirmation hearing.") (citations omitted). However, if it appears there is a defect that makes a plan inherently or patently unconfirmable, the Court may consider and resolve that issue at the disclosure stage thus avoiding the time and expense of a solicitation process and a confirmation hearing for a plan that is unconfirmable.  *Id.* (citations omitted); *see also In re U.S. Brass Corp.*, 194 B.R. 420, 422 (Bankr. E.D. Tex. 1996) ("Disapproval of the

adequacy of a disclosure statement may sometimes be appropriate where it describes a plan of reorganization which is so fatally flawed that confirmation is impossible"); *In re Felicity Assocs., Inc.*, 197 B.R. 12, 14 (Bankr. D.R.I. 1996) ("[i]t has become standard Chapter 11 practice that when an objection raises substantive plan issues that are normally addressed at confirmation, it is proper to consider and rule upon such issues prior to confirmation, where the proposed plan is arguably unconfirmable on its face"); *In re GSC, Inc.*, 453 B.R. 132, 157 n.27 (Bankr. S.D.N.Y. 2011) ("An unconfirmable plan is grounds for rejection of the disclosure statement; a disclosure statement that describes a plan patently unconfirmable on its face should not be approved."); *In re Quigley Co.*, 377 B.R. 110, 115-16 (Bankr. S.D.N.Y. 2007) ("If the plan is patently unconfirmable on its face, the application to approve the disclosure statement must be denied, as solicitation of the vote would be futile."); *In re Filex, Inc.*, 116 B.R. 37, 41 (Bankr. S.D.N.Y. 1990) ("A court approval of a disclosure statement for a plan which will not, nor [cannot], be confirmed by the Bankruptcy Court is a misleading and artificial charade which should not bear the imprimatur of the court.").

43.     A plan is considered "patently unconfirmable" if (i) confirmation defects cannot be overcome by creditor voting results and (ii) those defects concern matters upon which all material facts are not in dispute or have been fully developed at the disclosure statement hearing. *Am. Capital Equip.*, 688 F.3d at 154–55 (citing *In re Monroe Well Serv. Inc.*, 80 B.R. 324, 333 (Bankr. E.D. Pa. 1987)). In such circumstances, the related disclosure statement may not be approved.  To do otherwise would be to impose upon a debtor's estate the costs and expenses associated with an unnecessary solicitation and allow the debtor to waste further the time and resources of its creditors and this Court.  *See In re Pecht*, 57 B.R. 137, 139 (Bankr. E.D. Va. 1986) (declining to subject estate to expense of soliciting votes for unconfirmable plan); *In re*

*Valrico Square Ltd. P'ship*, 113 B.R. 794, 796 (Bankr. S.D. Fla. 1990) ("Soliciting votes and seeking court approval on a clearly fruitless venture is a waste of the time of the Court and the parties.").

44.     Given the infirmities that plague the Plan, the Debtors must cure the defects embodied in the Plan before continuing with approval of the Disclosure Statement and solicitation of votes to accept or reject a plan.[8]

### A.  The Plan Is Patently Unconfirmable Because It Cannot Satisfy Bankruptcy Code Section 1123(a)(4)

45.     Bankruptcy Code section 1123(a)(4) provides that a plan shall "provide the same treatment for each claim . . . of a particular class, unless the holder of a particular claim . . . agrees to a less favorable treatment of such particular claim. . . ."  See 11 U.S.C. 1123(a)(4).  The Plan fails to satisfy this requirement with respect to Class 5 Notes Claims as the Plan confers significant benefits upon the Noteholder Backstop Parties that are not available to all other Holders of Class 5 Claims.

### i.  The Plan Confers Significant Economic Benefits To The Noteholder Backstop Parties

46.     In the month leading up to the Petition Date, the Ad Hoc Group sought to improve upon the various proposals advanced by the Plan Sponsors.  The Ad Hoc Group was principally focused on improving the pre-"new money" equity splits and the rights offering economics as reflected by the successive settlement term sheets exchanged by the Plan Sponsors and the Ad Hoc Group.  The Plan Sponsors were steadfast in not offering anything more than a "tip" to all Holders of Class 5 Notes Claims on account of such claims.  However, the Plan Sponsors were

---

[8] The Committee anticipates raising additional objections to confirmation of the Plan at the appropriate time, including but not limited to the improper classification of the Notes held by the Plan Sponsors and the Notes Backstop Parties with non-Notes Backstop Parties in Class 5 in the unlikely event Class 5 Notes Claims votes to accept the Plan.  This classification scheme is inconsistent with Bankruptcy Code section 1122(a) and reflects an improper attempt to gerrymander the votes in favor of an acceptance.

willing to "steer" improved economics to "new capital providers" – namely, the members of the Ad Hoc Group.

47.     The improved economics, conditioned on the Ad Hoc Group's participation in a rights offering, took four principal forms:  (a) the members of the Ad Hoc Group would purchase equity through a rights offering at a discount to plan value; (b) the Debtors would pay a rights offering backstop fee to the members of the Ad Hoc Group; (c) the Debtors would pay an incentive fee (later referred to as a Participation Premium) to the members of the Ad Hoc Group as Rights Offering backstop parties; and (d) payment of the Ad Hoc Group's professionals fees by the Debtors.

48.     Nominally, the Plan Sponsors opened the Rights Offering to all holders of Notes Claims.  In reality, though, the Plan Sponsors assumed that the Ad Hoc Group would deliver the support of at least two-thirds of the Notes Claims and all of institutional holders of the Notes Claims actually interested in participating in the Rights Offering.[9]  The Plan Sponsors neither expected, nor desired, participation in the rights offering by the numerous, retail holders of the Notes.  The Debtors, consistent with this line of thinking, propose to limit participation in the Rights Offering to Accredited Investors.

49.     Those that are expected to participate in the Rights Offering, namely the Class 5 Notes Claims Holders who are Noteholder Backstop Parties, have positioned themselves to receive substantially greater recoveries under the Plan – through participation in the Rights Offering – than holders of Class 5 Notes Claims that are not Noteholder Backstop Parties.  As to any Holder of a Class 5 Notes Claim that is not a Noteholder Backstop Party, such Holder is ineligible to receive the Noteholder Backstop Commitment Fee and the related Noteholder

---

[9] News sources reported on the organization of the Ad Hoc Group months prior to the commencement of these Chapter 11 Cases and that current counsel and the financial advisors to the Ad Hoc Group advised the Ad Hoc Group.

Backstop Commitment Fee Shares.  As to any Holder of a Class 5 Notes Claim that is an Eligible Holder but declines to participate in the Rights Offering, such Holder is ineligible to receive the Participation Premium Shares.  The Plan reallocates those Participation Premium Shares to those participating in the Rights Offering – principally, the Noteholder Backstop Parties.  As to any Holder of a Class 5 Notes Claim that is not an Eligible Holder, the Plan denies such Holder the opportunity to participate in the Rights Offering and presumably purchase the Rights Offering Shares at a discount to Plan value.  The Plan reallocates the right to acquire those Rights Offering Shares to the Noteholder Backstop Parties.

50.     The value diverted under the Plan to the Noteholder Backstop Parties through the Rights Offering represents additional distribution to select holders of the Class 5 Notes Claims (i.e., the Noteholder Backstop Parties) that is unavailable to many of the Holders of the Class 5 Notes Claims that are not Noteholder Backstop Parties.  This disparate treatment renders the Plan unconfirmable under Bankruptcy Code section 1123(a)(4).

### ii.  The Stockholders Agreement Confers Enhanced Rights To The Noteholder Backstop Parties

51.     The Plan proposes to provide the Noteholder Backstop Parties, holders of Class 5 Notes Claims, with significant corporate governance benefits over the Reorganized Debtors that are not available to other holders of Class 5 Notes Claims.  For instance, pursuant to section 2.01 of the Stockholders Agreement (the "**SHA**"), attached as Exhibit I to the Disclosure Statement, the Noteholder Backstop Parties will have certain rights to designate one or more of the directors on the Reorganized Debtors' board of directors.  No such nomination rights are afforded to other non-Plan Investor parties.

52.     Additionally, section 8.1 provides as follows:

> The Company shall pay and reimburse each of the . . . Noteholder Backstop Parties for all of their reasonable costs and expenses associated with their due

diligence and preparation, negotiation, administration, syndication and closing of all definitive documentation relating to this Agreement and the transactions contemplated hereby or in connection with (including the investment in Equity Securities by . . . the Noteholder Backstop Parties . . . including the costs, fees and expense of legal counsel and other third party investors.

53.     Other Holders of Class 5 Notes Claims do not have the benefit of having their advisors paid for by the Debtors whether it is in connection with whether to invest in the Debtors, ensure compliance with the transfer restrictions set forth in Article IV of the SHA, or to enforce the minority Stockholder protections provided for in Sections 5.1 and 5.2 of the SHA.

**B.  The Plan Is Patently Unconfirmable Because It Cannot Satisfy Bankruptcy Code Section 1129(a)(3)**

54.     Bankruptcy Code section 1129(a)(3) provides that the court shall confirm a plan only if "[t]he plan has been proposed in good faith and not by any means forbidden by law."  11 U.S.C. § 1129(a)(3).  The Plan appears to be part of an improper scheme to avoid paying taxes by the Plan Sponsors.  This improper objective bars confirmation of the Plan pursuant to Bankruptcy Code section 1129(a)(3).

55.     Putting aside the confirmation requirements of Bankruptcy Code section 1129, the Debtors here should have no reason to oppose using a lower plan value for the debt-equity swap components of the Plan.  Ordinarily, a lower chapter 11 plan value associated with a debt-for-equity exchange results in additional cancellation of debt income ("**COD Income**") realized by a debtor.  Typically, COD Income requires a taxpayer to recognize income and pay the related tax liability.  However, under the circumstances of these Chapter 11 Cases, the Internal Revenue Code permits tax attributes to be reduced instead of immediate recognition of taxable income. Here, it is likely that the impact of additional COD Income will be immaterial for the Debtors as the Debtors appear to have limited tax attributes that would likely be largely eliminated at any

contemplated valuation.   Therefore, the Debtors would be economically ambivalent to their creditors' desires to manipulate their taxes associated with the debt obligations.

56.     By pushing the Debtors to reach a low enterprise valuation, as reflected in the Valuation Analysis, the Plan Investors may increase their tax loss (or reduce any gain depending on their applicable tax bases).  Assuming that the exchange is a taxable transaction as outlined in the Disclosure Statement (Disclosure Statement at 93), the Plan Sponsors that are U.S. taxpayers would recognize gain or loss equal to the difference between the fair market value of the property received (*i.e.*, the plan value) and their bases in the debt.  Thus, as the Holders' collective basis in the Class 4 Term Loan Claims is a fixed number, a lower Plan value results in a larger tax loss (or a reduced gain).

57.     The Disclosure Statement notes that "[i]t is anticipated that there will be no active trading market for the New Common Stock" and that "[t]he New Common Stock will be subject to restrictions on transfer."  *See* Disclosure Statement at 82.  The Plan's only indicia of fair market value for the New Common Stock is the Valuation Analysis prepared by PWP.

58.     As observed earlier, the Valuation Analysis is irrelevant to the Plan Sponsors' investment rationale.  After all, they agreed to support the Global RSA without the benefit of the Debtors' Valuation Analysis in the first instance.  Undoubtedly, they believe that the enterprise value of the Debtors significantly exceeds the range of values indicated in the Valuation Analysis.  Otherwise, their desire to, among other things, participate in the Rights Offering, provide the Plan Sponsor Commitment and continue to staunchly defend confirmation of the Plan would be utterly illogical and uneconomic behavior.  They have to disregard and dismiss the Valuation Analysis when conferring with their portfolio managers of investment committees.

But, at bottom, they know the Valuation Analysis was put together for an ulterior purpose: to substantiate their ability to take substantial tax losses or reduce potentially taxable gain.

59.     Accordingly, because Bankruptcy Code section 1129(a)(3) cannot be satisfied, the Plan is patently unconfirmable and the Debtors' request to proceed with solicitation of votes on the Plan should be denied.

### III.   THE VOTING AND SOLICITATION PROCEDURES AND RIGHTS OFFERING PROCEDURES SHOULD BE MODIFIED.

60.     The Disclosure Statement Motion seeks approval of certain proposed Rights Offering Procedures and Solicitation and Voting Procedures. The Committee has the following comments with respect to these procedures:

- **Key Dates and Deadline with Respect to the Plan and Disclosure Statement.**

The Committee and Debtors have "met and conferred" twice in connection with coordinating the Plan confirmation-related discovery timetable. The timetable proposed by the Debtors, as reflected in the Disclosure Statement Motion, is unduly compressed and provides the parties, including the Committee, with inadequate time to conduct necessary discovery in advance of the proposed Plan Objection Deadline.  The timetable proposed below, which is largely consistent with the schedule the Committee proposed to the Debtors, provides for a modest two-week enlargement of the confirmation timetable and impacts only the Plan Objection Deadline and Confirmation Hearing Date.  The Committee's proposed milestone dates are also within the deadlines prescribed by the Global RSA and Final DIP Order and, accordingly, modifying the Debtors' proposed schedule as set forth below would not require the consent of any parties impacted by the Global RSA or Final DIP Order.

| Date | Event |
|---|---|
| September 13, 2019 | Parties shall serve any document requests in connection with Plan Confirmation (the |

| Date | Event |
|---|---|
|  | "**Confirmation Document Requests**") |
| September 25, 2019 | Parties shall substantially complete production of document requests in response to Confirmation Documents Requests |
| October 9, 2019 | Cutoff for fact discovery, including the completion of any fact depositions |
| October 14, 2019 | Parties shall serve any initial expert reports |
| October 21, 2019 | Parties shall serve any rebuttal expert reports |
| October 25, 2019 | Parties shall complete any expert depositions |
| October 30, 2019 | *Plan Objection Deadline* |
| November 4, 2019 | Parties shall exchange final witness and exhibit list |
| November 6, 2019 | *Confirmation Hearing Date* |

- **Irrevocability of Subscriptions.**    The Debtors propose that each Qualified Noteholder may exercise all or any portion of such Qualified Noteholders' rights, and subject to the terms and conditions of the Rights Offering Procedures, all such subscriptions will be irrevocable.  The Rights Offering Procedures are annexed to the Disclosure Statement as Exhibit H.  Such procedures provide that the Subscription Rights, once exercised, are not revocable subject to the terms and conditions of the Subscription Agreement and Subscription Form.  The Subscription Agreement and Subscription Form, likewise, do not provide a Qualified Noteholder with the right to revoke participation in the Rights Offering.  Unlike other Qualified Noteholders, the Noteholder Backstop Parties may terminate their commitments under a number of different circumstances.    These  termination  provisions  should  be  equally  applicable  to  the  Non-Noteholder Backstop Parties until the Effective Date of the Plan.  As the Debtors note on multiple occasions, the Rights Offering is fully backstopped by the Noteholder Backstop Parties. Therefore, the Debtors suffer no prejudice in affording non-Noteholder Backstop Parties the opportunity to revoke their Rights Offering subscription.

- **Class 5 Note Holder Ballots.**  The ballot the Debtors propose to use to solicit votes on the Plan from Holders of Class 5 Notes Claims is attached to the proposed order as Exhibit 3C (the "**Beneficial Holder Ballot**").  Across 16 pages, the ballot provides instructions to Holders of Class 5 Notes Claims and solicits various information from the recipient of the ballot, including (a) the amount of the Class 5 Notes Claim, (b) a vote on the Plan, (c) an opt-out decision on the third party releases contained in the Plan, and (d) a certification of non-accredited investor status.  For ease of navigating the Beneficial Holder Ballot and to ensure that all items are completed, the Committee recommends condensing all of information requested from the recipient of the Beneficial Holder Ballot onto a single page.  In addition, the Beneficial Holder Ballot should make explicit that a Holder of a Class 5 Notes Claim is entitled to the treatment afforded to Class 5 Notes Claims under the Plan (assuming the Effective Date thereunder occurs) even if such Holder rejects the Plan and opts out of the Third-Party Releases contained in the Plan.  In addition, the Beneficial Holder Ballot should make explicit that a Holder of Class 5 Notes Claim that is not an Accredited Investor that rejects the Plan should nevertheless complete Item 5 (Certification of Non-Accredited Status) to receive the Participation Premium Shares pursuant to the Plan.

- **Debtors' Review Of Ballots.**  The Voting and Solicitation Procedures propose to provide the Debtors with wide latitude to waive defects or irregularities or to reject Ballots not in proper form.  The Debtors should consult with the Committee before exercising its discretion to count or disregard any Ballots.

## IV.   THE COURT SHOULD REQUIRE THE DEBTORS TO INCLUDE A COMMITTEE LETTER IN THE SOLICITATION MATERIALS.

61.   The Committee has identified a number of deficiencies with the Plan that, alone, merit denial of confirmation of the Plan.  The Committee is also of the view that Holders of

Class 5 Notes Claim should vote to reject the Plan.  The Committee has requested inclusion of a letter (the "**Committee Letter**") with the Debtors' solicitation package with the Committee's recommendation.  As of the date hereof, the Debtors have not approved this request.  The Committee proposes inclusion of a Committee Letter that would contain the Committee's recommendation that Class 5 Notes Claims **vote to reject the Plan** and an explanation of such recommendation.  The Committee respectfully requests that the Court authorize and direct the Debtors to include such letter in the solicitation materials so that it is highly visible to and easily accessible by, Holders of Class 5 Notes Claims.

62.     The Committee also anticipates inviting Holders of Class 5 Notes Claims to participate in one or more live "town hall" discussions (whether in-person meetings or by hosted conference call) during which the Committee's professionals will share information with creditors, consistent with the Committee's obligations under Bankruptcy Code section 1102(b)(3), related to the Plan.  The Committee, during such meetings, intends to solicit votes to reject the Plan consistent with the Solicitation Letter.  Details regarding such meetings and/or conferences will be included in the Committee Letter or disseminated through other means.

63.     Prior to the Petition Date, the Debtors and the Ad Hoc Group contacted several large Holders of Class 5 Notes Claims in an effort to get them on board with the Plan.  In some instances, those efforts failed to generate the support the Debtors and the Ad Hoc Group were hoping for.  The Committee also anticipates directly contacting these holdout Holders of Class 5 Notes Claims to solicit their rejection of the Plan.

64.     The Committee will not solicit votes from Holders of Class 5 Notes Claim until such time, consistent with Bankruptcy Code section 1125(b), that the Debtors transmit the Disclosure Statement to Holders of such claims or, in the event such Holders have not received

the Disclosure Statement, the Committee provides a copy of the Disclosure Statement to such Holders.

## **<u>RESERVATION OF RIGHTS</u>**

The Committee continues to analyze and review the Disclosure Statement and the Plan and reserves all rights in connection with confirmation of the Plan. The Committee submits this Objection without prejudice to, and with a full reservation of, the Committee's rights to supplement or amend this Objection in advance of, or in connection with, the hearing to approve the Disclosure Statement and/or confirmation of the Plan.

## CONCLUSION

**WHEREFORE**, for the foregoing reasons, the Committee respectfully requests that the Court:
(i) sustain this Objection; (ii) deny the relief requested in the Disclosure Statement Motion; and (iii) grant
the Committee such other and further relief as is just and proper.

Dated:  September 5, 2019
        Houston, Texas

<div align="right">

Respectfully submitted,
By: */s/ Hugh M. Ray, III*_____

**PILLSBURY WINTHROP SHAW PITTMAN
LLP**
Hugh M. Ray, III (State Bar No. 24004246)
William J. Hotze (State Bar No. 24087754)
Two Houston Center
909 Fannin, Suite 2000
Houston, TX 77010-1028
Telephone: (713) 276-7600
Email: hugh.ray@pillsburylaw.com
      william.hotze@pillsburylaw.com

- and -

**BROWN RUDNICK LLP**
Robert J. Stark (admitted *pro hac vice*)
Bennett S. Silverberg (admitted *pro hac vice*)
Andrew M. Carty (admitted *pro hac vice*)
Uchechi Egeonuigwe (admitted *pro hac vice*)
Seven Times Square
New York, NY 10036
Telephone: 212-209-4800
Email:   rstark@brownrudnick.com
bsilverberg@brownrudnick.com
acarty@brownrudnick.com
uegeonuigwe@brownrudnick.com

-and -

Jeffrey L. Jonas (admitted *pro hac vice*)
James Stoll (*pro hac vice* pending)
One Financial Center
Boston, MA 02111
Telephone: 617-856-8200
Email:   jjonas@brownrudnick.com

*Counsel for the Official Committee of Unsecured
Creditors*

</div>

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on September 5, 2019, a true and correct copy of the foregoing was served via email through the Bankruptcy Court's Electronic Case Filing System on the parties that have consented to such service.

<div align="right">
<u>/s/ Hugh M. Ray, III</u>
Hugh. M. Ray, III
</div>

**EXHIBIT A**

**Other Adequate Information Deficiencies**

| Issue No. | Disclosure Statement Section | Adequate Information Issue |
|---|---|---|
| 1 | Global comment | The Disclosure Statement notes that approximately 60% holders of Senior Notes have accepted the Plan pursuant to the Global RSA.  This amount is closer to 55%.<br><br>For context it is also important to note that 22% of the Notes are held by the Plan Sponsor Parties and the balance of the Notes (representing 33% of the outstanding Notes) are held by 8 affiliated alternative asset managers who, in exchange for voting to accept the plan, are receiving favorable treatment under the Plan, including but not limited to, the opportunity to backstop the rights offering in exchange for the backstop shares, payment of their professional fees and corporate governance rights. |
| 2 | I (Introduction) | The Disclosure Statement should make clear that Holders of Class 5 Notes Claims who reject the Plan are still entitled to receive the New Common Stock on account of their Class 5 Notes Claims, subscribe to the Rights Offering and receive the Participation Premium Shares if participating in the Rights Offering or if the Holder of a Class 5 Claim is ineligible to participate in the Rights Offering.<br><br>The Disclosure Statement should also make clear that the Debtors' executive officers are highly incentivized to support the Plan due to the Management Incentive Plan awards and assumption of their prepetition employment agreements upon the occurrence of the Effective Date. |
| 3 | Executive Summary; BII.B.2(c) | The proposed treatment of Class 3 RBL Claims described in the Disclosure Statement is inconsistent with the treatment provided for such claims in the Exit Facility Term Sheet.<br><br>The Exit Facility Term Sheet provides that, in addition to the Electing Lender's receipt of its *pro rata* share of commitments under the RBL Exit Facility, such Electing Lender (or RBL Lender) is also to receive "as part of the treatment of its Obligations under the Plan, a *pro rata* share of cash in an amount equal to the Initial Availability Amount on the Plan Effective Date."  *See* Exit Facility Term Sheet at 4. |

| Issue No. | Disclosure Statement Section | Adequate Information Issue |
|---|---|---|
| 4 | II.B (Overview of Plan) | The Disclosure Statement states that "[s]uccessful implementation of the Plan will avoid a sale of all or substantially all of the Debtors' assets."  All that can be stated is that consummation of the Plan avoids a sale during the Chapter 11 Cases.  The Debtors do not know the Plan Sponsors' intentions upon their ownership of the Debtors. |
| 5 | II.B.1 (Debt for Equity Exchange) | The statement that a key element of the Plan is the debt-for-equity exchange is misleading given the substantial number of shares to be distributed to the Plan Sponsor and Qualified Noteholders who participate in the Rights Offering. |
| 6 | II.B.5 (Plan Sponsor Backstop Commitment) | The statement that the proceeds from the Plan Sponsor Backstop Commitment will be used to "provide the Reorganized Debtors with liquidity upon emergence from the Chapter 11 Cases" is misleading.  The Debtors will use the entirety of the proceeds from the Plan Sponsor Backstop Commitment to discharge the DIP Claims and Class 3 RBL Claims. |
| 7 | II.B.5 (Plan Sponsor Backstop Commitment)/II.B.6 (Rights Offering and Noteholder Backstop Commitment) | The Disclosure Statement should state, to the extent applicable, the discount at which the Plan Sponsor and Noteholder Backstop Parties are acquiring the Plan Sponsor Backstop Commitment Shares and Rights Offering Shares, as applicable. |
| 8 | II.B.7 (Potential Additional Plan Liquidity Measures) | Debtors should disclose whether they will issue the Incremental Equity Investment or New Exit Note by the deadline for filing the Plan Supplement to enable holders of Class 5 Notes to vote to accept or reject and/or participate in the Rights Offering on a fully informed basis. |
| 9 | II.D (Treatment of Class 5 Notes Claims) | Projected recoveries in the table should be broken down as follows:<br><br>• Class 5 Noteholders that are ineligible to participate in the Rights Offering and return the Ballot indicating that they are not eligible to participate in the Rights Offering<br>• Class 5 Noteholders that are ineligible to participate in the Rights Offering but fail to return the Ballot indicating that they are not eligible to participate in the Rights Offering<br>• Class 5 Noteholders (excluding Noteholder Backstop Parties) that are eligible to participate in the Rights Offering and exercise their Rights Offering subscription rights |

| Issue No. | Disclosure Statement Section | Adequate Information Issue |
|---|---|---|
| | | • Class 5 Noteholders (excluding Noteholder Backstop Parties) that are eligible to participate in the Rights Offering and do not exercise their Rights Offering subscription rights<br>• Class 5 Noteholders that are Noteholder Backstop Parties<br>• Class 5 Noteholders that are Plan Sponsors<br><br>Disclosure Statement should affirmatively provide whether the Debtors intend to count Class 5 Notes Claims held in treasury for purposes of calculating Class 5 acceptance.<br><br>The Disclosure Statement should expressly provide for the treatment of pre- and post-petition fees and expenses of the indenture trustee for the Notes. |
| 10 | III (Voting Procedures) | The discussion of voting/solicitation procedures needs to take into account the beneficial/master ballot solicitation process discussed in the Solicitation Procedures Motion at paragraphs 43-50.  The procedures set forth in the Disclosure Statement are inapplicable to holders of Class 5 Notes Claims.<br><br>The Disclosure Statement should affirmatively provide whether the Debtors intend to count Class 5 Notes Claims held in treasury for purposes of calculating Class 5 acceptance. |
| 11 | III.D (Voting Instructions) | The Disclosure Statement should make clear that Holders of Class 5 Notes Claims who reject the Plan are still entitled to receive the New Common Stock on account of their Class 5 Notes Claims, subscribe to the Rights Offering and receive the Participation Premium Shares if participating in the Rights Offering or if the Holder of a Class 5 Claim is ineligible to participate in the Rights Offering. |
| 12 | IV.E (Executive Officers and Board of Directors) | The Disclosure Statement should disclose the connectivity the executive officers and members of the Board of Directors have with the Plan Sponsors. |
| 13 | V.D (Strategic Alternatives) | The Disclosure Statement should provide a more detailed chronology regarding the launching of the strategic alternative process and establishment of bidding deadlines.<br><br>The Disclosure Statement should state that the Debtors did not negotiate with any of |

| Issue No. | Disclosure Statement Section | Adequate Information Issue |
|---|---|---|
| | | the parties submitting the Proposals after receipt of such initial Proposals on or about the Initial Bid Deadline.<br><br>The Disclosure Statement should state the basis for Debtors' belief that the RBL refinance Proposal required the consent of the Term Loan lenders. |
| 14 | V.E (The Restructuring Support Agreement) | The Disclosure Statement should (i) describe the successive equity splits proposed by the term sheets advanced by the Ad Hoc Group of Senior Noteholders and the timing of delivery of such proposals, and (ii) describe the role of the Debtors and its advisors in achieving consensus on a restructuring.<br><br>The Disclosure Statement should describe the strawman proposal(s) the Debtors provided to the Plan Sponsors and Ad Hoc Group in an effort to achieve a consensual restructuring and the rationale behind its development.<br><br>Disclosure Statement should clarify that the statement "general unsecured creditors will be paid in full" is applicable only to holders of Class 6 General Unsecured Claims. |
| 15 | VI.B.2 (Debtor-in-Possession Financing) | References to the interim approval of the DIP should be omitted for clarity.<br><br>The Disclosure Statement should clarify that after extensive negotiations with the Committee, the Final DIP Order was entered by the Court on a consensual basis.<br><br>The Disclosure Statement should state that pursuant to the Final DIP Order the Committee was granted authority to, among other things, investigate the validity, enforceability and perfection of the Debtors' secured lenders' liens against the Debtors' assets and investigate any claims against the Debtors' secured lenders.<br><br>The Disclosure Statement should further state the deadline for the Committee to assert any challenge or claims against the Debtors' secured lenders. |
| 16 | VI.B.4 (Filing of Retention Applications and Related Motions) | The Disclosure Statement should elaborate on the bases of the Committee's objections to PWP's retention. |

| Issue No. | Disclosure Statement Section | Adequate Information Issue |
|---|---|---|
| 17 | VI.B.5 (Appointment of Official Committee of Unsecured Creditors) | The Disclosure Statement should reference the (proposed) retention of Brown Rudnick, Pillsbury, Miller Buckfire/Stifel and FTI. |
| 18 | VI.B.6(a) (Backstop Expenses Motion) | The final sentence should clarify that the Court entered the order granting the requested relief after the Debtors modified the proposed order in response to the Committee's objection.<br><br>The section should state the economics of the Houlihan Lokey and PJT engagement letters, including the payment of transaction/success fees under certain circumstances. |
| 19 | VI.C (Preference Analysis and Other Potential Avoidance Actions) | The Disclosure Statement should clarify the Debtors' intention to preserve Avoidance Actions against recipients of First Day Relief payments.<br><br>The Disclosure Statement should make clear that any resulting Bankruptcy Code section 502(h) claim is a Class 6 General Unsecured Claim entitled to payment in full. |
| 20 | VI.E (Assumption or Rejection of Executory Contracts and Unexpired Leases) | The Disclosure Statement should clarify that rejection damages will be treated as Class 6 General Unsecured Claims and will be paid in full as unimpaired claims. |
| 21 | VI.F (Exclusivity) | The Disclosure Statement should clarify that the solicitation exclusivity period does not prevent the Committee from soliciting votes to reject the Plan. |
| 22 | VII.C.4(a) (Exit Facility) | The Disclosure Statement should provide that no resolicitation of votes is required provided the Plan Supplement is timely filed and includes the terms of the Alternative Exit Facility. |
| 23 | VII.C.17 (Management Incentive Plan) | The Disclosure Statement should quantify the value of the Management Incentive Plan to recipients upon the Effective Date. |
| 24 | VII.E.4(d) (Minimum Distributions) | The Disclosure Statement should clarify the treatment of claims to the extent the Holder of such claim is entitled to less than one share. |
| 25 | VII.G.3(Releases by the Debtors) | Disclosure Statement should state whether the Debtors conducted an investigation of any claims held by the Debtors against the parties receiving a release and detail the scope of any such investigation. |

| Issue No. | Disclosure Statement Section | Adequate Information Issue |
|---|---|---|
| 26 | VII.K.12 (Votes Solicited in Good Faith) | The Disclosure Statement should provide that the Debtors will seek (and potentially obtain) a finding in the Confirmation Order that votes were solicited in good faith. It will not be deemed. |
| 27 | VIII.A (Liquidation Analysis) | The Disclosure Statement should state that the Liquidation Analysis improperly assumes that all of the Debtors' assets are encumbered by their secured lenders. The Debtors have been made aware by the Committee that a significant number of their assets, consisting primarily of its oil and gas reserve acreage, are unencumbered prepetition by their secured lenders' liens and may have significant value.  Depending on the liquidation value of the unencumbered property, which as of the date of the Disclosure Statement the Debtors have made no effort to estimate, the Plan may be unable to satisfy the best interests test. |
| 28 | VIII.B (Valuation Analysis) | The Disclosure Statement should indicate that PWP previously performed a valuation of the Debtors on behalf of certain of the Noteholder Backstop Parties in connection with a prior engagement and that such valuation of the Debtors may be materially greater than the values reflected in the Valuation Analysis. |
| 29 | XI.B.2 (Confirmation Without Acceptance By All Impaired Classes) | The Disclosure Statement should include language to the effect that the Committee disagrees with the Debtors' conclusion that the Plan satisfies the Bankruptcy Code section 1129(b) cram down requirements as to Class 5 Notes Claims as set forth in the Committee Solicitation Letter. |
| 30 | XII.A(3) (Failure to Satisfy Voting Requirements) | The third paragraph was likely borrowed from a case involving a prepetition solicitation.  Solicitation will occur only following Court approval of solicitation of votes to accept or reject the Plan.<br><br>Disclosure Statement should provide that notwithstanding the amount of claims covered by the RSA (i.e., approximately 60%), Class 5 may nevertheless reject the Plan if sufficient number of holders of Class 5 Notes Claims vote to reject the Plan given the hundreds of retail holders of the Class 5 Notes Claims. |
| 31 | XII.A(4) (Termination of Restructuring Support Agreement) | The Disclosure Statement should make clear that termination of the Global RSA may lead the Debtors to pivot to the Initial RSA or a restructuring on other terms. |
| 32 | XII.A(5) (Non-Confirmation or Delay of Confirmation of the Plan) | Omit the first sentence of the second paragraph; redundant of second sentence of the first paragraph. |

| Issue No. | Disclosure Statement Section | Adequate Information Issue |
|---|---|---|
|  |  | Second paragraph should make clear that it is possible that Class 5 Notes Claims votes to reject the Plan.<br><br>Third paragraph, second sentence.  A dissenting holder would allege that the solicitation was not in compliance with the Solicitation Procedures Order and the Bankruptcy Code.  Court is going to pre-approve the balloting procedures before solicitation commences.<br><br>Final paragraph.  Note that the Committee is likely to lodge an objection to confirmation of the Plan if the Debtors are unable to agree on the terms of a consensual restructuring with the Committee. |
| 33 | XII.A(6) (Non-Consensual Confirmation) | The Disclosure Statement should provide that the Committee is likely to lodge an objection to confirmation of the Plan if the Debtors are unable to agree on the terms of a consensual restructuring with the Committee. |
| 34 | XII.A(13) (Ability to Discharge or Satisfy Prepetition Claims) | The Disclosure Statement should state that without establishing a bar date, the magnitude of Class 6 General Unsecured Claims to which the Debtors may be exposed is unknown.<br><br>The Disclosure Statement should provide that Class 6 General Unsecured Claims may be allowed in such amounts such that a further restructuring may be required after the Effective Date.<br><br>The Disclosure Statement should provide that the Debtors will dispute all Class 6 General Unsecured Claims in a non-bankruptcy court forum. |
| 35 | XII.B.3 (Substantial Leverage; Ability to Service Debt) | The Exit Facility Term Sheet provides that $455 of the RBL Exit Facility will be deemed funded upon the Effective Date.  This is inconsistent with statement in Disclosure Statement that there will be indebtedness of between $350-400 million under the Exit Facility upon emergence. |
| 36 | XII.C(3) (Restrictions on Transfer) | The Disclosure Statement should provide support for Debtors' conclusion that the New Common Stock will be held by fewer than 300 holders upon the Effective Date. |

**Exhibit B**

**Rights Offering Research**



An Acuris Company

Transaction Trends Overview

1Q2016 – 2Q2019

# Rights Offerings: Oil & Gas

## Restructuring Data Report

July 17, 2019

Joshua Friedman
Global Head of Restructuring Data
212.574.7867
Joshua.Friedman@acuris.com

Brian Darsow
Legal Analyst
212.390.7810
Brian.Darsow@acuris.com

Tuo Han
Data Analytics Intern
347.389.2324
Tuo.Han@acuris.com

Jack M. Tracy II
Global Head of Legal Analytics
646.378.3177
Jack.Tracy@Acuris.com



| | |
|---|---|
| Executive Overview | 03 |
| Market Trends in Oil & Gas Rights Offerings | 04 |
| Breakdown by quarter | 06 |
| Breakdown by sub-sector | 08 |
| Key Analytics | 09 |
| Discount to Plan Value | 11 |
| Backstop Fees | 12 |
| Who's Who: Backstop Parties | 14 |
| Chapter 15 Oil & Gas Rights Offerings | 16 |
| Disclaimer | 18 |

An Acuris Company

# Executive Overview

Powered by *Debtwire*'s **Restructuring Database**, the latest **Rights Offerings Report** tracks and analyzes Oil & Gas rights offerings for companies that filed for Chapter 11 since the beginning of 2016, with some additional information on foreign Chapter 15 filers. From the beginning of 2016 through the second quarter of 2019, investors committed to inject around USD 9.7bn through rights offerings—disproportionately in the oil & gas (O&G) sector, which is responsible for over two-thirds of the rights offering dollars.

*Data Analyzed*

We tracked the most salient and most negotiated data points for rights offerings:

- **Volume and subsector**: The data tells us that rights offerings are becoming an increasingly relevant option for Chapter 11 debtors.

- **Proportion of plan value**: This data tells us how significant the rights offering is with respect to the value of the reorganized company; in other words, it tells us how much new money investors put into a company in comparison to its value.

- **Discount to plan value**: This tracks the built-in value that investors are receiving to inject new money into companies that they will own (in whole or part) after the bankruptcy case is complete.

- **Backstop data**:  Our data, which is pulled from the filed backstop agreements and plan documentation, highlights key points of negotiation, such as backstop commitment premiums and termination fees.



An Acuris Company

1Q2016 – 2Q2019

# Market Trends in Oil & Gas Equity Rights Offerings



## Market Trends

Since 2016, we have seen the continuation of the trend of rights offering transactions in the bankruptcy space, as energy-related companies starved for capital and in need of substantial balance sheet deleveraging restructured in Chapter 11.

The need to raise new money via a rights offering as part of a plan of reorganization (as opposed to solely reducing debt burdens or raising new debt) is a recurring theme in many of the recent large and complex restructuring situations.

In more than a few cases, the amount of common stock issued in the rights offering is sufficient to determine the new owners of the company. In other words, the terms of rights offerings are often more than just leftover recovery details for a subordinated class of creditors.

In the first half of 2019, there are already three new proposed rights offerings in the O&G: **Bristow Group, Legacy Reserves** and **Weatherford International**.

*High-Level Takeaways*

- Since the beginning of 2016, 27 O&G companies that filed Chapter 11 or Chapter 15 bankruptcy petitions used rights offerings to effectuate their corporate restructuring.

- Investors poured just over USD 6.5bn of new money into bankrupt O&G companies through rights offerings over this time, with additional funds occasionally raised in companion private placements (e.g., **Seadrill, Breitburn**).



## Rights Offerings (by amount, USDm)

## Rights Offerings (by number)

**Note**: We used the plan effective date to establish the closing date, and thus the relevant quarter, for the respective rights offerings. Totals only include Chapter 11 filers.

Source: *Debtwire*'s Restructuring Database



# Chapter 11 Oil & Gas Debt and Equity Rights Offerings (by quarter completed)

| Quarter | Offering Amount (USDm) | # of Cases | Discount to Plan Value (average) | Backstop Commitment Premium (average) | Rights Offerings |
|---|---|---|---|---|---|
| Q3 2016 | 50.0 | 1 | 25.0% | 6.0% | Penn Virginia |
| Q4 2016 | 235.0 | 2 | 22.5% | 8.9% | Basic Energy Services<br>Key Energy Services |
| Q1 2017 | 1575.0 | 5 | 23.2% | 7.4% | C&J Energy Services<br>CHC Group<br>Chaparral Energy<br>LINN Energy<br>Triangle USA Petroleum |
| Q2 2017 | 788.0 | 2 | 29.5% | 6.0% | Bonanza Creek<br>Ultra Petroleum |
| Q3 2017 | 136.0 | 1 | 25.0% | 6.0% | Vanguard Natural Resources |
| Q4 2017 | 125.0 | 1 | 37.0% | 6.0% | GulfMark Offshore |
| 1Q 2018 | 200.0 | 1 | 25.0% | 5.0% | Expro Holdings |
| 2Q 2018 | 990.0 | 2 | 4.0% | 8.0% | Breitburn Energy Partners<br>Fieldwood Energy |
| 3Q 2018 | 167.5 | 1 | 80.0% | 6.0% | Seadrill |
| 4Q 2018 | 460.0 | 1 | 47.0% | 6.0% | Pacific Drilling |
| 1Q 2019 | 95.0 | 1 | 48.0% | 7.0% | Parker Drilling |
| Pending | 1716.5 | 3 | TBD | 6.0% | Bristow Group<br>Legacy Reserves<br>Weatherford International |

**Notes:** Discounts to plan value have not yet been disclosed or confirmed for Bristow Group, Legacy Reserves and Weatherford International.  Breitburn, Vanguard, Pacific Drilling, and Seadrill also had significant complementary direct equity investments or companion private placements not included in the above totals.

Source: *Debtwire*'s Restructuring Database

Debtwire
An Acuris company

Restructuring Data Report

Rights Offerings: Oil & Gas
Market Trends

An Acuris Company

# Chapter 11 Oil & Gas Rights Offerings (USDm)



Source: *Debtwire*'s Restructuring Database

8



An Acuris Company

1Q2016 – 2Q2019

# Key Analytics



# Key Analytics

## Plan Values vs. Equity Rights Offerings Amount, by Chapter 11 Filer
**(Plan Values Over USD 700m)**

## Plan Values vs. Equity Rights Offerings Amount, by Chapter 11 Filer
**(Plan Values Under USD 700m)**

Notes: Charts include offerings of securities convertible into equity. Figures for each debtor include total of all offerings/tranches of the debtor's rights offering.
Source: *Debtwire*'s Restructuring Database

# Discount to Plan Value in O&G Rights Offering Cases

- Investors are generally incentivized to put in new money through a rights offering because they are able to purchase equity in the reorganized company at a discount to the valuation used in the company's Chapter 11 plan.

- Giving a discount on the rights offering shares helps to ensure that sufficient shares are purchased, making it more likely that enough cash will be raised to fund ongoing operations and creditor recoveries.

- On the flip side, the ability to invest in equity at a discount disproportionately benefits deeper-pocketed pre-petition creditors (even including those investing in securities post-petition to make a play at the reorganized equity) at the expense of those that cannot (or will not) invest further.

- Typically, the discount on the rights offering shares ranges between 10%-25%. Outliers at the higher end, however, are not uncommon.

- A number of notable restructurings used significant plan discount values in their offerings, including Seadrill, Parker Drilling and Pacific Drilling.

- Occasionally, a company may not need to offer any discount, particularly if participants believe the plan's estimate of the value of the reorganized company is already low or if the rights offering itself is less of a play for the reorganized equity.



Number of Chapter 11 Offerings in Disclosed Discount Range

■ 0%-20%   ■ 20%-30%   ■ >30%

| Company | Discount to Plan Value | Plan Value (USDm) |
|---|---|---|
| Seadrill | 79.7% | 3,937 |
| Parker Drilling | 48.0% | 425 |
| Pacific Drilling | 46.9% | 1,472 |
| Bonanza Creek | 39.0% | 690 |
| GulfMark Offshore | 37.0% | 329 |
| CHC Group | 31.0% | 544 |
| **Mean** | **30.0%** | |
| **Median** | **25.0%** | |
| **Mode** | **25.0%** | |

<u>Note</u>: The basis of the CHC discount is the ultimate value of the equity the investors will receive in relation to their USD 300m investment (ie, including OID and equitization premium). Seadrill's estimated consolidated reorganized equity value was USD 3.224bn-USD 4.650bn; participants in the USD 48.1m equity rights offering were permitted to purchase as much as 6.025% of the new Seadrill common stock in total, subject to dilution by certain stock-denominated fees and new common stock issued pursuant to management incentive plans. Rights offerings that do not involve an issuance of common equity or a security convertible thereto, or for which a plan value was not disclosed, are not included in these calculations.

An Acuris Company

# Backstop Fees in O&G Rights Offering Cases

- Backstop fees—including commitment premiums and break-up fees—are among the most important and highly negotiated aspects of a rights offering.

- When the bankruptcy plan is contingent on a certain amount of new money being raised in the rights offering, backstop parties will have significant leverage in negotiating their fees (although the court will still have to approve the fees).

- Typically, backstop fees are ~6% of the total dollar amount of the rights offering, payable in shares rather than cash, and the fees are earned whether or not the rights offering is fully subscribed. In general, the higher-end backstop fees come when the backstop parties receive a set percentage of the new equity.

  - Thus, the backstop fees allow institutional creditors with extra capital and appetite for additional equity exposure to acquire an ever greater share of ownership in the reorganized company.

- If the company cancels the rights offering, the backstop parties are typically owed a termination fee in cash, usually an amount equal to the cash equivalent value of the backstop fee.

- In the last three years, backstop fees largely hewed to the established norms. Only a few backstop fees fell below 5%; in Pacific Drilling, the judge sua sponte challenged a proposed 8% fee, which was lowered to 5%.



Disclosed Backstop Commitment Premium

| Company Name | Backstop Commitment Premium | Offering Size (USDm) |
|---|---|---|
| CHC Group | 10.3% | 300 |
| Key Energy Services | 10.0% | 110 |
| Breitburn Energy Partners | 10.0% | 465 |
| Chaparral Energy | 8.8% | 60 |
| Berry Petroleum / LINN Energy | 7.0% | 830 |
| **Mean** | **6.6%** | |
| **Median** | **6.0%** | |
| **Mode** | **6.0%** | |

Note: We have included separate backstop fees for LINN Energy (4%) and Berry Petroleum (7%).



An Acuris Company

1Q2016 – 2Q2019

# Who's Who: O&G Rights Offering & Backstop Parties

Case 19-33395   Document 419   Filed in TXSB on 09/05/19   Page 56 of 60

Restructuring Data Report
Rights Offerings: Oil & Gas
Backstop Advisors

An Acuris Company

# Most Frequent Disclosed Backstop Parties

| Backstop Participants | Backstop Commitments | Companies | Backstop Participants | Backstop Commitments | Companies |
|---|---|---|---|---|---|
| Whitebox Advisors | 6 | Basic Energy Services<br>Bonanza Creek<br>Key Energy Services<br>Pacific Drilling<br>Parker Drilling<br>Seadrill | JPMorgan | 5 | LINN Energy<br>Penn Virginia<br>Triangle USA Petroleum<br>Ultra Petroleum<br>Vanguard Natural Resources |
| Contrarian Capital Management | 5 | CGG<br>Chaparral Energy<br>Key Energy Services<br>Penn Virginia<br>Vanguard Natural Resources | Elliott Management Corporation | 3 | Breitburn Energy Partners<br>Expro Holdings<br>LINN Energy |
| Franklin Templeton Investments / Franklin Advisers | 5 | Breitburn Energy Partners<br>Chaparral Energy<br>CHC Group<br>LINN Energy<br>Triangle USA Petroleum | Highbridge Capital Management | 3 | Breitburn Energy Partners<br>Pacific Drilling<br>Parker Drilling |
| | | | York Capital Management | 3 | LINN Energy<br>Ultra Petroleum<br>Vanguard Natural Resources |

Source: *Debtwire*'s Restructuring Database

14



An Acuris Company

1Q2016 – 2Q2019

# Chapter 15 Rights Offerings: Oil & Gas

**Debtwire**
An Acuris company

An Acuris Company

# Chapter 15 Filers

Rights offerings in bankruptcy cases generally remain much more numerous among US Chapter 11 filers than among foreign filers seeking US recognition of foreign proceedings under Chapter 15, although proportionally rights offerings are more common in Chapter 15 filers than Chapter 11 filers (approximately 10% compared to 7%). Six Chapter 15 filers have disclosed rights offerings as part of their O&G restructuring plans since the beginning of 2016.

The largest Oil & Gas Chapter 15 rights offering issuer since the beginning of 2016 was the French petroleum geosciences company **CGG**, with a new money capital raise of the equivalent of over USD 500m.

**Tervita**'s Canada-based bankruptcy includes the second largest Oil & Gas Chapter 15 rights offering since 2016 with a USD 313m debt rights offering.



**Rights Offerings Amount, Foreign Jurisdiction (USD equivalent)**



An Acuris Company

# Contacts

## Rights Offerings Report: Oil & Gas

### DEBTWIRE RESTRUCTURING INSIGHTS

**Joshua Friedman,** Global Head of Restructuring Data
+1 212 574 7867 / joshua.friedman@acuris.com

**Jack M. Tracy II,** Global Head of Legal Analytics
+1 646 378 3177 / jack.tracy@acuris.com

**Brian Darsow,** Legal Analyst
+1 212 390 7810 / brian.darsow@acuris.com

**Sarah Foss,** Legal Analyst
+1 646 239 0533 / sarah.foss@acuris.com

**Sara Tapinekis,** Legal Analyst
+1 646 412 5330 / sara.tapinekis@acuris.com

**Catherine Corey,** Legal Analyst
+1 516 407 2052 / catherine.corey@acuris.com

**Rong Ren,** Analyst
+1 646 412 5318 / rong.ren@acuris.com

**Qian Yi,** Analyst
+1 646-378-3152 / qian.yi@acuris.com

**Tuo Han,** Data Analytics Intern
tuo.han@acuris.com

**Jayjeet Sharma,** Data Analytics Intern
jayjeet.sharma@acuris.com

### DEBTWIRE SALES

**Natasha Brooks,** Head of Fixed Income Sales, Americas
+1 212 686 5340

Natasha.Brooks@acuris.com

**Jonathan Reed,** Managing Director
+1 212 686 5418,

Jonathan.Reed@acuris.com



An Acuris Company

# Debtwire is an Acuris company



Debtwire reports on corporate debt situations before credit ratings are changed. Offering unique insights, credit analysis, debt data, and analytics for distressed debt and leveraged finance markets.

Subscribers choose Debtwire for speed and depth of coverage they can't get anywhere else. Our reporters talk to an impressive range of contacts every day to bring you valuable early insight into fast evolving situations.

To complement your newsfeed, Debtwire's credit analysis and research teams provide deep technical details and angles that help you understand situations more clearly.

- Follow corporate debt situations as they unfold
- Find mandate opportunities in stressed/distressed/restructuring situations, ahead of the market
- Get real-time news on market-moving events sent to your mobile or email
- Get the full story on restructurings and the players involved
- Understand how regulatory developments are affecting asset-backed securities
- Capture early stage primary opportunities and stay on top of the leveraged market

**EMEA**
**10 Queen Street Place**
**London**
**EC4R 1BE**
**United Kingdom**
**+44 (0)203 741 1000**
sales@acuris.com

**Americas**
**1501 Broadway**
**8th Floor**
**New York**
**NY 10036 USA**
**+1 212 500 7537**
sales.us@acuris.com

**Asia**
**Suite 1602-6**
**Grand Millennium Plaza**
**181 Queen's Road**
**Central Hong Kong**
**+ 612 9002 3131**
sales.asia@acuris.com

## Disclaimer

We have obtained the information provided in this report in good faith from sources that we consider to be reliable, but we do not independently verify the information. The information is not intended to provide tax, legal or investment advice. We shall not be liable for any mistakes, errors, inaccuracies or omissions in, or incompleteness of, any information contained in this report. All such liability is excluded to the fullest extent permitted by law. Data has been derived from company reports, press releases, presentations and Debtwire intelligence.

Debtwire.com