**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re: | ) ) Chapter 11 |
| | ) |
| LEGACY RESERVES INC., *et al.*,[1] | ) Case No. 19-33395 (MI) ) |
| | ) (Jointly Administered) |
| | ) |
| Debtors. | ) **Ref Dkt. Nos. 494 and 498** |
| | ) |
| | ) **Hearing Date:  November 6, 2019 at 10:00 a.m. (CT)** |
| | ) **Objection Deadline:  October 28, 2019 at 4:00 p.m. (CT)** |

**OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED**
**CREDITORS TO CONFIRMATION OF JOINT CHAPTER 11 PLAN OF**
**REORGANIZATION OF LEGACY RESERVES INC. AND ITS DEBTOR AFFILIATES**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are:  Legacy Reserves Inc. (9553); Legacy Reserves GP, LLC (1065); Legacy Reserves LP (1069); Legacy Reserves Finance Corporation (1181); Legacy Reserves Services LLC (2710); Legacy Reserves Operating LP (7259); Legacy Reserves Energy Services LLC (1233); Legacy Reserves Operating GP LLC (7209); Dew Gathering LLC (4482); Pinnacle Gas Treating LLC (3711); Legacy Reserves Marketing LLC (7593). The location of the Debtors' service address is: 303 W. Wall St., Suite 1800, Midland, TX 79701.

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ..........................................................................................1

FACTUAL BACKGROUND ............................................................................................6

I.   GENERAL CASE BACKGROUND. ...........................................................................6

II.  GSO AND THE GLOBAL RSA. ...............................................................................6

III. THE PLAN. .................................................................................................................9

IV.  THE SOLICITATION OF THE PLAN. ...................................................................10

V.   THE VALUATION OF THE REORGANIZED DEBTORS. .................................13

    A.  The Stifel/Platt Sparks Expert Valuation Reports. ...........................................15

    B.  The TPH Expert Valuation Report. ....................................................................18

    C.  The Stifel/Platt Sparks Rebuttal Expert Valuation Reports. .............................19

    D.  The Committee Identifies Unencumbered Assets Of Significant Value. ..........24

OBJECTION ...................................................................................................................26

I.   THE PLAN CANNOT BE CONFIRMED BECAUSE THE DEBTORS HAVE
    FAILED TO MEET THE REQUIREMENTS OF BANKRUPTCY CODE
    SECTION 1129(A). .....................................................................................................26

    A.  The Debtors Cannot Satisfy Bankruptcy Code Section 1129(a)(1)
       Because The Plan Does Not Treat Class 5 Notes Claim Holders Equally. ......26

    B.  The Debtors Cannot Satisfy Bankruptcy Code Section 1129(a)(2)
       Because The Debtors Failed To Properly Solicit Class 5 Notes Claims. .........30

    C.  The Debtors Cannot Satisfy Bankruptcy Code  Section 1129(a)(3)
       Because The Plan Has Not Been Proposed In Good Faith. ...............................33

    D.  The Debtors Cannot Satisfy Bankruptcy Code  Section 1129(a)(7)
       Because Class 5 Notes Claim Holders  Will Receive Less Than They Would
       Under A Chapter 7 Liquidation. ........................................................................35

    E.  The Debtors Cannot Satisfy Bankruptcy Code  Section 1129(a)(11)
       Because The Plan Is Not Feasible. .....................................................................37

i

II. THE PLAN CANNOT BE CONFIRMED BECAUSE IT IS NOT
FAIR AND EQUITABLE TO HOLDERS OF CLASS 5 NOTES CLAIMS. ........................40

    A. The Stifel Report Establishes That The Plan Is Not "Fair And Equitable"
Because It Provides Value To Holders Of Class 4 Term Loan Claims In Excess of
The Value Of Their Claims...............................................................................................40

    B. The Plan Improperly Allocates Value Of Unencumbered Assets To Secured
Creditors. ...........................................................................................................................42

III. THE SETTLEMENTS ENCOMPASSED IN THE PLAN DO NOT
SATISFY THE ELEMENTS OF RULE 9019 OF THE FEDERAL
RULES OF BANKRUPTCY PROCEDURE ........................................................................44

CONCLUSION .............................................................................................................................47

CERTIFICATE OF SERVICE .....................................................................................................48

The Official Committee of Unsecured Creditors (the "**Committee**"), duly appointed in the Chapter 11 cases of Legacy Reserves Inc. and its affiliated debtors and debtors-in-possession (collectively, the "**Debtors**"), submits this objection (the "**Objection**") to confirmation of the *Joint Chapter 11 Plan Of Reorganization For Legacy Reserves Inc. And Its Debtor Affiliates* [Docket No. 498] (the "**Plan**").[2]  In support of this Objection, the Committee respectfully states as follows:

## PRELIMINARY STATEMENT

1.       The Plan is a culmination of the Debtors' efforts to ride roughshod over the Committee's goal to secure a fair recovery for all unsecured creditors, including non-institutional, retail holders of the Debtors' Senior Notes.  At every turn in these cases, the Debtors, with the assistance of the Plan Sponsor, GSO Capital Partners LP ("**GSO**"), have not so subtly sought to disenfranchise holders of the Senior Notes and thwart the Committee's efforts to maximize the value of these estates and discover the true distributable value of the Debtors' estates.  These machinations included: (i) engaging in a half-hearted and rushed sale process that was not geared towards obtaining value maximizing going concern bids but was intended to be 'evidence' of a lack of market interest for the Debtors' present purposes; (ii) buying the cooperation of an *ad hoc* group of holders of the Senior Notes (the "**Ad Hoc Group**") through lucrative rights offering benefits; (iii) dissuading the Office of the United States Trustee from forming the Committee; (iv) manufacturing postpetition borrowing needs well in excess of what has been proven necessary to justify an outsized rollup on the prepetition RBL and an accelerated case timetable; (v) covering all of the expenses of the Committee's adversaries in these cases as they oppose the Committee's efforts at every opportunity; (vi) attempting to disenfranchise retail holders of Class 5 Notes

---

[2]       Capitalized terms used in this Objection but not otherwise defined shall have the meaning ascribed to them in the Plan and the *Disclosure Statement for the Joint Chapter 11 Plan of Reorganization for Legacy Reserves Inc. and Its Debtor Affiliates* [Docket No. 499] (the "**Disclosure Statement**").

Claims of their right to vote on the Plan by failing to adhere to the Court approved Solicitation Procedures; (vii) disregarding the value unencumbered assets might provide to Class 5 Notes Claims; and (viii) when all else fails, concocting an artificially low valuation that is based on projections belied by the Debtors' operating history and industry norms to justify confirmation of the Plan.  The result is a Plan that was not proposed in good faith and instead suppresses value in favor of select constituencies.

2.      Importantly, these value destructive actions are not solely of the Debtors' doing. For years, the Debtors' board of directors has had close ties with GSO − a holder of the Debtors' Term Loan and Senior Notes.  Among other affiliations and business arrangements, the Debtors' current CEO, James Daniel Westcott, is a former principal of GSO, and the current President of GSO was a board member of the Debtors until late last year.  When the Debtors failed to address their looming RBL maturity, GSO and the RBL lenders were placed in a position to exert significant leverage over the Debtors to reach their ideal economic outcome.

3.      Meanwhile, the Ad Hoc Group – though capably represented – could do nothing but capitulate to GSO's proposed terms once GSO managed to run out the clock and reached its own deal with the RBL lenders.  GSO had made it clear to the Ad Hoc Group that it was not providing value to them just to make peace.  GSO wanted class acceptance and incentivized the Ad Hoc Group's advisors to secure such acceptance.[3]  The Ad Hoc Group represented that it, together with GSO's holdings, could control the noteholder class under a reorganization plan.  So, although the Ad Hoc Group did little to benefit noteholders at large, it did manage to secure itself better treatment under the Plan's proposed rights offering.  In a bit of irony, the Ad Hoc Group did

---

[3]      The Ad Hoc Group retained Houlihan Lokey Capital, Inc. ("**Houlihan**") as its financial advisor and investment banker pursuant to an engagement letter dated April 1, 2019 (the "**HL Engagement Letter**").  By the terms of the HL Engagement Letter, the Debtors are to pay Houlihan a $2 million "Deferred Fee" upon consummation of a chapter 11 plan only "to the extent that such Chapter 11 plan is accepted by at least two-thirds of the Noteholders in amount and more than one half in number including Notes held by GSO."  *HL Engagement Letter*, at 2.

not control Class 5 Notes Claims as the class voted to reject the Plan, and GSO is still giving up significant value to the Ad Hoc Group.

4.     Upon execution of the Global RSA, the Debtors needed a valuation that would retroactively fit their scheme.  Soon, the Debtors' financial advisors produced an enterprise valuation which, due to its artificially low value with a midpoint of $825 million, bizarrely suggests that GSO and the Ad Hoc Group are investing at a premium to reorganized equity value, an outcome inconsistent with distressed investing.  Moreover, the Debtors' liquidation analysis suggests that the new exit loan facility is underwater on day one, another jarring economic barometer.

5.     To keep management on-message, the Debtors propose providing them with a management incentive plan (MIP) which, astonishingly, will deliver the management team more value than what the Senior Note holders are receiving on account of their claims.  At the hearing on the Debtors' Disclosure Statement, Westcott readily acknowledged that he was incentivized to pursue GSO's plan due to the MIP.

6.     The Committee, whose constituency includes almost $200 million of mostly retail "mom and pop" bondholders, was left with the task of retaining its own investment bankers and financial advisors to determine whether the economic anomalies suggested by the Debtors' valuation were in fact warning signals that the valuation was unreliably conservative.  Perhaps not surprisingly, as the Committee's experts will attest at trial, the total enterprise value, even in this temporarily depressed market, is more than $300 million greater that what is proselytized by the Debtors.  Of course, once that fact is accepted, the investment decisions of GSO and the Ad Hoc Group make complete sense and perfectly clear that the Debtors' plan cannot "cram down" the dissenting Class 5 Notes Claims.  The Committee's valuation demonstrates that GSO, on account

of its Term Loan Claims, is receiving in excess of 100% of the value on account of such claims. Accordingly, the Debtors cannot satisfy the fair and equitable test as required by Bankruptcy Code section 1129(b) under these circumstances.

7.     The Committee's advisors also issued a report in rebuttal to the Debtors advisors' valuation.  From this report, it is evident that myriad deficiencies render the Debtors' valuation unreliable, including: (i) incongruity between the valuation analysis and standard industry practice; (b) utilization of draconian methodologies resulting in off-market valuations; and (c) irreconcilable values.  In all, the Committee's rebuttal report observes that by incorrectly deriving EBITDAX, the Debtors' advisors are "suppressing ~$230-340mm of value."

8.     On the Petition Date, the Debtors sought to fast track these cases and confirm their improper Plan with as little opposition as possible.  Despite evidence that DIP financing was unnecessary, the Debtors presented a "parade of horribles" that would result if they failed to secure such post-petition financing.  The result is a DIP facility with milestones that have unnecessarily fast-tracked these cases.

9.     Moreover, the Debtors sought to prevent the formation of an official committee in these cases in the first instance.  Through the Debtors' first day relief, the Debtors proposed to pay tens of millions of dollars to supposed critical vendors when, in reality, the Debtors paid nearly every trade creditor.  Fortunately, this charade was unsuccessful and the Office of the United State Trustee ultimately appointed the Committee.

10.     Following the Petition Date, the Committee also undertook an effort to validate the Debtors' stipulations from the Final DIP Order and asserted affirmative claims against the lenders. The Committee identified a significant number of parcels that are unencumbered.  A report issued by the Debtors' advisors ascribes a value of these properties of between ████████████

██████ **liquidation value**.  This significant unencumbered value renders the Plan unconfirmable because, as discussed herein, the Debtors cannot satisfy the "best interests test" or the "fair and equitable test" incorporated into Bankruptcy Code section 1129.  It also raises significant disclosure (or lack of disclosure) issues.

11.     Finally, it is clear that the Plan is not the product of good faith on the part of the Debtors.  Throughout this process, the Debtors have shown that their interests lie in appeasing GSO and confirming a plan that misstates value at GSO's behest.  The Debtors' board of directors' connectivity to GSO has proved to be an impairment on the Debtors' ability to propose a plan in good faith.  The Debtors' management instead has their eyes set on the MIP and GSO's abilities to appoint the majority of the new board of the reorganized Debtors.  The Debtors have gone to great lengths to achieve the Court's sanction of this scheme, even including the disenfranchisement of Senior Note holders' right to vote on the Plan by soliciting votes in a manner out of compliance with this Court's order.  And even though this last-ditch effort failed and Class 5 Notes Claims voted down the patently unfair plan, the "effort" is emblematic of the bad faith behavior that has permeated this case from before its inception.

12.     The Debtors' offensive attempt to buttress the Plan's *bona fides* by suggesting that the Committee has produced no alternative plan or party willing to purchase the Debtors is further evidence of bad faith.  It is **not** the Committee's duty to identify a superior alternative plan; the burden of proof for confirmation of the Plan remains on the Debtors.  It **is** the Committee's job to ensure that any plan is premised on a reliable and accurate valuation, that the Debtors are not siphoning off unencumbered assets for the benefit of their secured creditors, and that the plan is proposed in good faith rather than in an effort to appease a future owner.   The Debtors have failed to make these showings.

13.     Accordingly, for these reasons and those contained herein, the Committee submits that the Court should deny confirmation of the Plan.

## FACTUAL BACKGROUND

**I.     General Case Background.**

14.     On June 18, 2019 (the "**Petition Date**"), each of the Debtors filed voluntary petitions under Chapter 11 of the Bankruptcy Code.  Since the Petition Date, the Debtors have continued to operate and manage their businesses as debtors-in-possession pursuant to Bankruptcy Code sections 1107(a) and 1108.

15.     On July 3, 2019, the Office of the United States Trustee appointed the Committee. *See Notice of Appointment of Committee of Unsecured Creditors* [Docket No. 179].   The Committee's membership presently consists of:  (i) Wilmington Trust, National Association, in its capacity as indenture trustee for the Senior Notes; (ii) Dalton Investments, LLC; (iii) John M. Dinkel; and (iv) Nicholas Mumford.

16.     On August 2, 2019, the Debtors filed the Plan and Disclosure Statement.  The Debtors subsequently filed revised versions of the Plan and Disclosure Statement on August 18, 2019 [Docket Nos. 372, 373], September 9, 2019 [Docket Nos. 453, 454], and September 13, 2019 [Docket Nos. 488, 489].

17.     On September 16, 2019, the Court approved the Disclosure Statement and Solicitation Procedures (the "**Solicitation Procedures Order**") [Docket No. 494].

**II.     GSO And The Global RSA.**

18.     GSO − the Plan sponsor with holdings in the Debtors' Term Loan and Senior Notes − has historically enjoyed a close relationship with the Debtors' management team.  The Debtors' current CEO, James Daniel Westcott, is a former principal of GSO.  *See Declaration of James*

*Daniel Westcott in Support of the Debtors' Chapter 11 Petitions and First Day Pleadings* [Docket No. 2] (the "**Westcott Decl.**") ¶ 1.  While Westcott states that that he did not participate in the many executive sessions over the weeks leading up to the approval of the Global RSA (defined below),[4] Westcott maintains a small financial interest in GSO funds and has maintained a relationship with the principal parties at GSO working on these Chapter 11 Cases.  *See* Tr. of Hrg. Held 8/4/2019 at 104:16-20.

19.     The Debtors' board connectivity to GSO is not limited to Westcott.  Dwight Scott, the current President of GSO, was a board member of the Debtors until late last year.  Further, when Dwight Scott resigned from the Legacy board in October 2018, the Debtors appointed Doug York to fill his place.[5]  York, in turn, is a Co-Founder and Managing Director of Sequel Energy Group LLC, an oil and gas company formed in November 2016 by York and GSO.  York and GSO would go on to form Sequel Energy Group II LLC in February 2019.[6]

20.     In April 2019, in the midst of a hurried sale process that ultimately failed to yield any meaningful bids for the Debtors' assets, the Debtors began negotiating with GSO and other parties to secure a restructuring support agreement.  *See* Westcott Decl. ¶¶ 45-48.  On June 10, 2019, unable to reach consensus with an ad hoc group of holders of the Senior Notes (the "**Ad Hoc Group**"), the Debtors and GSO entered into a restructuring support agreement (the "**Initial RSA**") with over 75% in amount of the RBL Lenders and 100% of the Second Lien Lenders.  *See id.* at ¶ 49.  The Initial RSA offered, among other things, a draconian treatment to holders of the Senior

---

[4]     *See Supplemental Declaration Of James Daniel Westcott In Support Of Debtors' (I) Backstop Professional Fee Motion And (II) Exit Facility Fee Motion* [Docket No. 309], ¶ 7.

[5]     *See* Legacy Reserves Inc. Announces Board Resignation and Appointment, (2018), http://www.prnewswire.com/news-releases/legacy-reserves-inc-announces-board-resignation-and-appointment-300727175.html.

[6]     *See* GSO Capital Partners Announces the Expansion of its Partnership with Sequel Energy Group to Pursue Drilling Joint Ventures and Non-Operated Oil & Gas Transactions, (2019), https://www.marketwatch.com/press-release/gso-capital-partners-announces-the-expansion-of-its-partnership-with-sequel-energy-group-to-pursue-drilling-joint-ventures-and-non-operated-oil-gas-transactions-2019-02-28.

Notes by way of a $100.0 million rights offering conditioned on their class acceptance of the plan. *See id.*

21.     With GSO holding all of the leverage and a looming expiration of the forbearance period with the RBL Lenders approaching on June 18, 2019, the Ad Hoc Group came back to the negotiating table.  On June 13, 2019, the Ad Hoc Group capitulated, and the parties entered into the Restructuring Support Agreement (the "**Global RSA**") by and among the Debtors, GSO (as holders of the prepetition term loan), certain holders of the prepetition RBL loans, and certain holders of the unsecured Senior Notes (including the Ad Hoc Group and GSO).  *See* Westcott Decl., ¶ 3, 50; Global RSA § 4.02(b)(ii), attached as Ex. B to Westcott Decl.

22.     Pursuant to the Global RSA and the Plan contemplated thereunder, GSO, as Plan Sponsor, is slated to receive approximately 87% of the reorganized Debtors' common equity and control over the Debtors' board of directors.  *See* Global RSA, Annex I (Equity Ownership Percentages).

23.     The Global RSA contemplates the allowance of GSO's prepetition Term Loan Claims in an aggregate amount of approximately $365 million, and an allocation of approximately 51.4% of the reorganized Debtors' common equity on behalf of such prepetition Term Loan Claims.  *See id.*; Global RSA, Restructuring Term Sheet.

24.     The balance of GSO's equity allocation is derived from allocations under a proposed $189.8 million equity commitment, its share in a $66.5 million rights offering and related backstop fees, and in respect of GSO's holdings of the Senior Notes (GSO holds approximately 25% of the face amount of the Senior Notes).  *See* Global RSA, Annex I (Equity Ownership Percentages).  Members of the Ad Hoc Group are backstopping a portion of the rights offering.

25.     The RSA further contemplates a Management Incentive Plan (the "**MIP**"), pursuant to which current management is allocated at least 5% of the reorganized Debtors' common equity upon consummation of the Global RSA plan, and the opportunity to obtain up to 10% in the aggregate of the reorganized Debtors' common equity, with the ultimate allocation among management team members to be determined by GSO-selected board members at a later date.  *See* Global RSA, MIP Term Sheet.  The MIP and its expected returns served as an important incentive for GSO to enter into the Global RSA.  *See* Tr. Hrg. Held 9/10/2019 at 116:1-8.

26.     Further, the Global RSA plan provides that the reorganized Debtors will enter into go-forward employment contracts with its current management team, including Westcott, on economic terms consistent with their current employment arrangements.

27.     Participating Senior Note holders are offered the opportunity to purchase a small slice of the reorganized Debtors' common equity under a proposed Rights Offering, with nonparticipating Senior Note holders allocated a meager 2.5% of the reorganized Debtors' common equity under the Global RSA plan on account of their Senior Notes holdings.  *See* Global RSA, Annex I (Equity Ownership Percentages).  Notably, the equity allocation to the Senior Noteholders is less than the 5% MIP allocation to the Debtors' three-person management team, and such MIP allocation dilutes the Senior Noteholders' recovery.

**III.     The Plan.**

28.     In accordance with the Global RSA, the Plan provides, among other things, for the following:

- Conversion of all Term Loan Claims into equity in the Reorganized Debtors (the Term Loan New Common Stock Shares).  Under this debt-for-equity exchange, the lenders under the Term Loan Credit Agreement will allocate a portion of their recovery to Holders of Allowed General Unsecured Claims and Holders of Allowed Senior Notes.  Senior Notes in the amount of $464.6 million (all Senior Notes held by Holders other than Legacy Reserves LP) will be exchanged for the Notes Claims

Shares allocated under the Plan, and all Senior Notes held by Legacy Reserves LP will be cancelled pursuant to the Plan and Legacy Reserves LP will not receive an allocation of Notes Claim Shares;

- A senior secured first lien reserve-based revolving credit facility in a maximum amount of $500 million;

- A Plan Sponsor Backstop Commitment, pursuant to which the Plan Sponsor Backstop Parties have committed to invest $189.8 million through the purchase of the Plan Sponsor Backstop Commitment Shares;

- A Rights Offering consisting of $66.5 million of Rights Offering Shares offered to Qualified Noteholders (*i.e.*, Accredited Investors), backstopped by the Noteholder Backstop Parties who will receive a Noteholder Backstop Commitment Fee;

- Full and final satisfaction of the RBL Claims in exchange for distributions under the RBL Exit Facility or New Term Loan Facility;

- Final satisfaction of the Term Loan Claims in exchange for the Term Loan New Common Stock Shares, representing a 53.9%-83.4% recovery under current Plan value;

- Final satisfaction of the Senior Notes Claims in exchange for the Notes Claim Shares, plus Subscription Rights and related Participation Premiums to Qualified Noteholders, representing a 3.1%-4.8% recovery under current Plan value, or 2.0%-3.0% without taking into account the Participation Premium Shares;

- Full and final satisfaction of General Unsecured Claims in exchange for a cash payment or reinstatement;

- Implementation of the MIP; and

- Appointment of a board of directors of the reorganized debtors consisting of Westcott, five GSO-appointed directors, and Kyle M. Hammond.

*See* Plan at 2-10; Stockholders Agreement of Legacy Reserves Inc., attached as Exhibit 1 to the *Second Plan Supplement* [Docket No. 654].

## IV.   The Solicitation Of The Plan.

29.   The Solicitation Procedures Order approved, among other things, the form of, and distribution of, Solicitation Packages to parties entitled to vote on the Plan.  In accordance with

Bankruptcy Rule 3017,[7] the Solicitation Procedures Order approved the Debtors' proposed methods under the Solicitation and Voting Procedures for soliciting the votes of Beneficial Holders through their Nominees.  *See* Solicitation Procedures Order ¶ 8.

30.    The Solicitation Procedures Order and the Solicitation and Voting Procedures required the Solicitation Packages to include "detailed voting instructions and a pre-addressed, postage pre-paid return envelope."  *See* Solicitation Procedures Order ¶ 6; Solicitation and Voting Procedures at 2.  Further, the Disclosure Statement, at section III.C, in describing the voting procedures, stated that Solicitation Packages would include "a Ballot or Ballots (and return envelopes(s)) that you may use in voting to accept or to reject the Plan."  *See* Disclosure Statement at 11.  The Debtors also included a cover letter with the Solicitation Packages that stated that such packages would include "a Ballot, together with detailed voting instructions and a pre-addressed, postage pre-paid return envelope."  *See* Cover Letter (attached as Exhibit 5 to the Solicitation Procedures Order), at 2.

31.    For Beneficial Holders of Class 5 Notes Claims, the Debtors distributed the Solicitation Packages through the reorganization support departments of the holders' respective Nominees, rather than through the Nominee's proxy departments.  *See Debtors' Objection To The Emergency Motion Of The Official Committee Of Unsecured Creditors For Order (I) (A) Compelling Debtors To Comply With Solicitation Procedures Order And (B) Extending Voting Deadline With Respect To Debtors' Proposed Chapter 11 Plan And/Or (II) Granting Equitable Relief Deeming Class 5 Notes Claims To Reject The Plan* [Docket No. 602]*,* ¶ 15.

---

[7]    Bankruptcy Rule 3017(e) provides that "[a]t the [disclosure statement hearing], the court shall consider the procedures for transmitting the documents and information required by subdivision (d) of this rule to beneficial holders of stock, bonds, debentures, notes, and other securities, determine the adequacy of the procedures, and enter any orders the court deems appropriate.  Fed. R. Bankr. P. 3017.

32.     Soon after commencement of the Debtors' solicitation of votes on the Plan, the Committee realized that the Solicitation Packages served upon Class 5 Notes Claims did not contain, as required by the Solicitation Procedures Order, a return envelope or other directions on how to relay completed ballots to the Nominee or Voting Agent.  Moreover, as set forth on the Certificate of Service filed by Kurtzman Carson Consultants LLC ("**KCC**" or the "**Voting Agent**") on October 3, 2019 [Docket No. 556] (the "**Solicitation Certificate of Service**"), the Debtors included the Subscription Form (as defined by the Certificate of Service) and Subscription Agreement (as defined by the Solicitation Certificate of Service) in the same mailing as the Solicitation Packages.  The inclusion of these additional materials was in contravention of the Solicitation Procedures Order.

33.     The unauthorized exclusion of the return envelope left Beneficial Holders, including all of the members of the Committee who are Beneficial Holders of Class 5 Notes Claims, without clear means to transmit their completed Beneficial Holder Ballots for tabulation by the Nominees.

34.     Certain other creditors contacted the Committee's counsel through email, individual Committee members or the Committee through its Twitter account, @Legacy_OCC, for assistance in voting.  The Committee members and their professionals undertook the effort to discern the voting process with respect to the Nominees of these Holders.

35.     When the Committee raised these issues with the Debtors, the Debtors proposed to resolve them by resoliciting through the Nominee's proxy departments, but insisted on maintaining the original Voting Deadline.  This solution was no solution at all, as the Beneficial Holders would not have received the new Solicitation Packages until just days prior to the Voting Deadline.  The Debtors' proposal further required the Committee to waive any rights to object to confirmation of

the Plan based on the improper solicitation.  The Committee declined to accept the Debtors' proposal.

36.     On October 11, 2019, the Committee filed the *Emergency Motion Of The Official Committee Of Unsecured Creditors For Order (I)(A) Compelling Debtors To Comply With Solicitation Procedures Order And (B) Extending Voting Deadline With Respect To Debtors' Proposed Chapter 11 Plan And/Or (II) Granting Equitable Relief Deeming Class 5 Notes Claims To Reject The Plan* [Docket No. 592] (the "**Emergency Resolicitation Motion**").  The Emergency Resolicitation Motion alleged that the Debtors, in violation of the Solicitation Procedures Order: (i) failed to ensure that Beneficial Holders of Class 5 Notes Claims received a return envelope or proper instructions on how to submit their Ballots; and (ii) included extraneous and unnecessary materials − the Subscription Form and Subscription Agreement −  in the Solicitation Packages, which further  confused the Beneficial Holders.   The Committee therefore requested that the Debtors resolicit Beneficial Holders of Class 5 Notes Claims or that the Court deem Class 5 Notes Claims to reject the Plan.

37.     On October 15, 2019, the Court entered the *Order On Emergency Motion Filed By The Official Committee Of Unsecured Creditors* [Docket No. 606], stating that the Court will treat the Emergency Resolicitation Motion as a confirmation objection to be heard at the Confirmation Hearing.

## V.     The Valuation Of The Reorganized Debtors.

38.     Included in the Debtors' Disclosure Statement is a valuation analysis (the "**Valuation  Analysis**") prepared by Perella Weinberg  Partners LP ("**PWP**").   *See* Valuation Analysis (attached as Exhibit F to Disclosure Statement).  As set forth herein, the Committee asserts the Valuation Analysis undervalues the Debtors' total enterprise value by upwards of $350

million.  PWP arrived at an estimated range of the Enterprise Value of the Reorganized Debtors of between $725 million and $925 million, with a midpoint estimate of approximately $825 million.  *Valuation Analysis*, at 3.  At PWP's mid-point enterprise valuation of $825 million, holders of Class 5 Notes Claims are projected to recover 2.5% on account of such claims in the form of New Common Stock (excluding any stock received on account of the Rights Offering).  Prior to the Petition Date, the Plan sponsors and the Ad Hoc Group were negotiating allocations of the reorganized Debtors' equity based upon significantly higher Plan valuations.  Several of the term sheets exchanged by the parties implied Plan total enterprise values in excess of $1 billion.

39.    On September 5, 2019, the Committee objected to the Disclosure Statement because,  among other things, the Valuation Analysis is unreliable because the Plan Sponsor Backstop Parties (including GSO) and the Noteholder Backstop Parties would be investing in the reorganized Debtors at significant premiums to the proposed Plan value.[8]  The Committee was justified in its concerns.  As demonstrated in the chart below, based upon the Committee's valuation of the Debtors, the Plan Sponsor Backstop Parties and the Noteholder Backstop Parties are actually investing in the reorganized Debtors at a significant discount – a result more in-tune with the realities of distressed investing.

---

[8]    *See Objection Of The Official Committee Of Unsecured Creditors To Debtors' Motion For Entry Of An Order (I) Approving The Adequacy Of The Disclosure Statement, (II) Approving The Solicitation And Voting Procedures With Respect To Confirmation Of The Proposed Joint Chapter 11 Plan Of Reorganization For Legacy Reserves Inc. And Its Debtor Affiliates, (III) Approving The Forms Of Ballots And Notices In Connection Therewith, (IV) Approving The Rights Offering Materials, (V) Scheduling Certain Dates With Respect Thereto, And (VI) Granting Related Relief* at ¶¶ 24-30 [Docket No. 419] (the "**Committee Disclosure Statement Objection**").

## Rights Offering Discount / Premium Comparison(1) ($MM)

### Equity Value

| | Stifel Valuation | | | PWP Valuation | | |
|---|---|---|---|---|---|---|
| | Low | Mid | High | Low | Mid | High |
| Enterprise Value | $1,050 | $1,160 | $1,275 | $725 | $825 | $925 |
| Less: Post Emergence Net Debt | (360) | (360) | (360) | (360) | (360) | (360) |
| **Equity Value** | **$690** | **$800** | **$915** | **$365** | **$465** | **$565** |

### Equity Value vs. Implied Second Lien Backstop Commitment Valuation

| | Stifel Valuation | | | PWP Valuation | | |
|---|---|---|---|---|---|---|
| | Low | Mid | High | Low | Mid | High |
| 2L Backstop Commitment Amount | $190 | $190 | $190 | $190 | $190 | $190 |
| Equity Received | 32.8% | 32.8% | 32.8% | 32.8% | 32.8% | 32.8% |
| **Implied Equity Value - 2L Backstop** | **$578** | **$578** | **$578** | **$578** | **$578** | **$578** |
| Equity Value | 690 | 800 | 915 | 365 | 465 | 565 |
| *Equity Value Variance vs. 2L Backstop* | *$112* | *$222* | *$337* | *($213)* | *($113)* | *($13)* |
| *Implied Premium / (Discount)* | *-16.2%* | *-27.7%* | *-36.8%* | *58.4%* | *24.3%* | *2.3%* |

### Equity Value vs. Implied Rights Offering (GSO & Backstop Parties) Valuation

| | Stifel Valuation | | | PWP Valuation | | |
|---|---|---|---|---|---|---|
| | Low | Mid | High | Low | Mid | High |
| Rights Offering Amount | $67 | $67 | $67 | $67 | $67 | $67 |
| Equity Received(2) | 13.0% | 13.0% | 13.0% | 13.0% | 13.0% | 13.0% |
| **Implied Equity Value - R.O.** | **$512** | **$512** | **$512** | **$512** | **$512** | **$512** |
| Equity Value | 690 | 800 | 915 | 365 | 465 | 565 |
| *Equity Value Variance vs. Implied R.O. Value* | *$178* | *$288* | *$403* | *($147)* | *($47)* | *$53* |
| *Implied Premium / (Discount)* | *-25.8%* | *-36.0%* | *-44.1%* | *40.3%* | *10.1%* | *-9.4%* |

(1) Equity splits assume an emergence date of October 31, 2019.
(2) Equity received assumes 100% of the participation premium allocated to rights offering participants.

### A. The Stifel/Platt Sparks Expert Valuation Reports.

40.     On October 15, 2019, Stifel Nicolaus & Co., Inc. and Miller Buckfire & Co. LLC (together, "**Stifel**") issued the expert report of Christian Gibson and Jerome Grisko III[9] (the "**Stifel Report**") on behalf of the Committee, attached hereto as **Exhibit A** and FTI Platt Sparks ("**Platt Sparks**") issued the expert report of Carter Davis (the "**Platt Sparks Report**") on behalf of the Committee, attached hereto as **Exhibit B**.

---

[9]     The Committee initially designated Mr. Gibson as one of the Committee's testifying expert on issues relating to valuation.  However, because of an unexpected health issue of a family member, Mr. Gibson's mother, Mr. Gibson is no longer available to testify at the Confirmation Hearing.  As a result, Mr. Grisko is now designated as an expert witness on behalf of the Committee on valuation issues.

41.     In conjunction with the development of the Stifel Report, Stifel reviewed the Permian Basin type curves developed by the Debtors.[10]  Soon after their review began, the Stifel team noticed discrepancies between the Debtors type curves and the underlying data provided by the Debtors in support of their type curves.  In response, the Committee directed Platt Sparks to perform a petroleum engineering analysis of the Debtors' type curves for the Permian Basin and to determine the appropriate type curves for this region.  Platt Sparks, in turn, analyzed and developed new type curves for 28 of the Debtors' type curves.[11]  Upon completing its work, Platt Sparks concluded that "[m]any of [the Debtors'] type curves do not match the underlying well data" and that Platt Sparks' type curves "are a better fit of the underlying analog well data." *Platt Sparks Report*, at 5.

42.     Stifel, relying in part on type-curve analysis of Platt Sparks,[12] arrived at a total enterprise value ("**TEV**") of the reorganized Debtors of between $1,050 million and $1,275 million, reflecting a mid-point valuation of approximately $1,160 million.

43.     Stifel utilized three generally accepted valuation methodologies, applying a different weighting to each, as summarized below:

- **Sum-of-the-Parts Net Asset Value Analysis.**  Stifel calculated an implied enterprise value range of $875 million to $975 million by independently estimating and combining the following Debtor components: (i) proved developed reserves; (ii) undeveloped reserves; (iii) workovers; (iv) Freestone Area Midstream System; (v) hedges; and (vi) corporate G&A expense.

    Stifel weighted this methodology at 30%, accounting for the fact that: (i) the methodology calculates net asset value using the NYMEX strip prices at a single point in time, which does not account for commodity price volatility; and (ii) three

---

[10]    Type curves are "forecasts of future oil, gas and water volumes that are expected to be produced from oil and gas wells." *Platt Sparks Report*, at 6.  For the Permian Basin, prior to the Petition Date, the Debtors "developed more than 50 type curves to estimate future expected production from more than 300 potential well locations in the Permian Basin of West Texas and Southeast New Mexico." *Id.* at 13.

[11]    According to Platt Sparks, these 28 type curves "represent greater than 97% of the value of the Debtors' Permian Basin undeveloped locations." *Platt Sparks Report*, at 5.

[12]    In reliance on the expert analysis provided by Platt Sparks of the type curves utilized by the Debtors, Stifel has opined that TPH's failure to remodel the Debtors' type curves alone results in undervaluing the Debtors' total enterprise value by approximately $65 million on a NAV basis. *Stifel Report*, at 23.

adjustments to assumptions within the Debtors' Aries DB (as such term is defined by the Stifel Report) can drive material changes in net asset value.

- **Comparable Companies Analysis.** Stifel calculated an implied enterprise value range of $1,075 million to $1,350 million by analyzing reference peer groups to capture the characteristics of the Debtors' two E&P asset groups, namely: (i) the Permian asset, which represents the primary growth driver for the Debtors but requires significant CAPEX; and (ii) the assets in East Texas, the Rockies, and MidCon, which exhibit low production decline and more steady, predictable cash flow.

  Stifel weighted this methodology at 40%, given the strong number of comparable companies and belief that public trading multiples represent the most timely and transparent valuation metrics available.

- **Precedent Transaction Analysis.** Stifel calculated an implied enterprise value range of $1,150 million to $1,450 million by considering precedent transactions going back to 2016. In performing this analysis, Stifel considered: (i) the similarities between the Debtors' assets and selected transactions; and (ii) the prevailing market conditions when each deal was consummated.

  Stifel weighted this methodology at 30%, given the limited number of recent transactions, the current state of the natural gas market, and the perceived shift in investor sentiment from growth to manufacturing.

44.    Stifel's varied weighting of these methodologies recognizes current market conditions. Intrinsic valuation methodologies such as NAV analyses price assets at a singular point in time in a highly volatile market (which is now approaching a six-month low), necessarily failing to form a comprehensive view of going-concern enterprise value. The totality of Stifel's valuations is depicted below:



**B. The TPH Expert Valuation Report.**

45.     On October 15, 2019, Tudor, Pickering & Holt & Co ("**TPH**") issued the expert report of Chad Michael (the "**TPH Report**") on behalf of the Debtors.  The TPH Report is consistent with the Valuation Analysis attached as an exhibit to the Disclosure Statement insofar as it concludes a midpoint total enterprise value of $825 million.  The TPH Report presents the results of the Debtors' so-called pre- and post-petition sales efforts[13] as "relevant data points to consider in an assessment of the market's view of [the Debtors'] value, through the lens of what a willing buyer would be willing to pay to a willing seller."  *TPH Report*, at 12.  The results of the so-called sales process are not used directly by TPH to derive a TEV valuation opinion; rather, it

---

[13]     On October 24, 2019, PWP filed *First Consolidated Monthly Fee Statement of Perella Weinberg Partners LP for Allowance of Compensation and Reimbursement of Expenses as Financial Advisor for the Debtors and Debtors in Possession for the Period from June 18, 2019 to and Including August 31, 2019* [Docket No. 671] (the "**PWP Fee Application**").  According to the PWP Fee Application, from June 18, 2019 through August 31, 2019, Mr. Kevin Cofsky, PWP's lead partner, spent no time on post-petition sales or marketing efforts.  Mr. Michael of TPH spent a total of total of 10 hours (2 hours each on August 26, 2019, August 27, 2019, August 28, 2019, August 29, 2019 and August 30, 2019) during that same 2.5 month period on "buyer outreach."  No other PWP or TPH employees recorded time towards "buyer outreach" on those days.

is presented as a form of corroborating evidence that TPH's valuation is not only "right," but perhaps too generous. This gilding of the lily, of course, exaggerates the economic anomalies already pervading the Plan created by TPH's valuation. In any event, it ineluctably follows that, if the sales process was flawed or deficient in any way, TPH's reliance on the "results" in developing its valuation is similarly infected.

46.     Still, not content in persuading just how "worthless" these Debtors are, ███████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████

### C. The Stifel/Platt Sparks Rebuttal Expert Valuation Reports.

47.     Stifel issued the rebuttal expert report of Christian Gibson and Jerome Grisko III (the "**Stifel Rebuttal Report**") on behalf of the Committee, attached hereto as **Exhibit C** and Platt Sparks issued the rebuttal expert report of Carter Davis (together with the Stifel Report and the Platt Sparks Report, the "**Committee Expert Reports**") on behalf of the Committee, attached hereto as **Exhibit D**, in response to the TPH Report.

48.     Across the 70 pages of the Stifel Rebuttal Report, Stifel offers a critique of the TPH Report. The Stifel Rebuttal Report concludes that:

- ***TPH arrived at reorganized total enterprise value through a combination of inappropriately applied valuation methodologies and flawed assumptions; and***

- ***The collective effect of these errors materially understates the value of the Debtors.***

49.     Specifically, the Stifel Rebuttal Report concludes that TPH's TEV range of between $725 million and $925 million was the product of several fundamentally flawed analyses that materially suppress value.  The Stifel Rebuttal Report distills the errors to: (a) modeling EBITDAX in a manner not comparable to the Debtors' peers; (b) draconian methodologies resulting in off-market valuations; and (c) irreconcilable values.

50.     <u>Modeled EBITDAX Is Not Comparable To Debtors' Peers.</u>  One of Stifel's principal critiques of the TPH Report is that the EBITDAX "is not derived on the same basis as its peers."  *Stifel Rebuttal Report*, at 8.  Stifel observes that despite over 20 years of upstream oil and gas investment banking experience, Mr. Michael of TPH elected to ignore general industry practices and chose to value the Debtors "in a vacuum."  *See Stifel Rebuttal Report,* at 4.  After correcting for these errors, Stifel concludes that the total enterprise value derived by four of the six valuation methodologies utilized by TPH "materially increase."

51.     By way of example, Stifel observes that, in low-commodity priced markets, it is common industry practice to "shut-in" wells that become uneconomic.  The EBITDAX modeled by TPH assumes that the Debtors continue to operate uneconomic wells even though the Debtors' past history "strongly suggests that they would not continue to run uneconomic wells."  *Id.*  By curtailing production of uneconomic wells, 2019E EBITDAX ████████████, 2020E EBITDAX ████████████, and 2021E EBITDAX ████████████.  *Stifel Rebuttal Report*, at 22.

52.     Another component of TPH's improper EBITDAX modeling is its assumption that workovers will continue even when unjustifiable at current prices.  According to Stifel, "TPH did not scale costs to the current environment thus [] modeling unrealistic workovers."  *Id.*  By adjusting assumptions regarding workovers, 2019E EBITDAX ████████████, 2020E

EBITDAX █████████████████, and 2021E EBITDAX ████████████████.  *Stifel*

*Rebuttal Report*, at 28.

53.     A third example of TPH's improper EBITDAX modeling is its erroneous use of

NYMEX strip pricing.  In contrast to the TPH Report, the Stifel Report applies analyst consensus

pricing published by the Institutional Brokers Estimate System (or I/B/E/S) to drive estimates of

the Debtors' EBITDAX.  It is uncontroversial that NYMEX provides a better datapoint for actual

commodity prices as of a specific point in time.   However, accurate data as of a specific point in

time is of little utility when a valuation exercise involves comparing the financial metrics of

various companies incorporating commodities pricing opinions inherently different from NYMEX

at the aforementioned point.

54.     The inputs for valuation of an enterprise, such as the Debtors, necessarily requires

the EBITDAX estimates included in analyst research reports for comparable companies.  The

analysts producing these reports have different perspectives on commodities pricing.[14]  To make

matters more complicated, the analysts form these opinions at various points in time.  It thus is

important to normalize those different views on commodity prices so that EBITDAX comparisons

of the Debtors and their peers are on an "apples to apples" basis.  In Stifel's opinion, I/B/E/S

pricing provides that consensus view.  *Stifel Rebuttal Report*, at 31.  The alternative, which is

impractical, is to recalculate each analyst's EBITDAX estimates for the  peer companies using a

common commodity price deck, such as NYMEX.  This simply is not done.[15]

---

[14]     The analysts producing these reports recognize that commodities pricing can be extremely volatile. They would need to update their research reports to reflect the daily swing in commodity prices if they used NYMEX pricing.  Instead, they use a price deck that they believe is representative of a "normalized" deck and do not turn to NYMEX for this purpose.  Accordingly, their EBITDAX estimates are already "normalized" *away* from the daily gyrations of NYMEX.

[15]     Notably, TPH, in the non-bankruptcy context, utilizes I/B/E/S pricing information when asked to provide fairness opinions on M&A transactions.  For example, TPH considered I/B/E/S pricing in their fairness opinions in connection with the mergers of (a) Concho Resources Inc. and RSP Permian, Inc., (b) Chesapeake Energy Corporation and WildHorse Resource Development Corporation, (c) Bill Barrett Corporation and Fifth Creek Energy Operating Company, LLC, and (d) Diamondback Energy and Energen Corporation.

55.     Notably, TPH did not normalize the EBITDAX estimates for the Debtors' peer companies using a NYMEX pricing deck before calculating TEV/EBITDAX multiples for the Debtors' peer companies.  So, embedded within the EBITDAX multiples are numerous divergent views on commodity pricing at the time the research note was published.  Nevertheless, TPH applies that multiple to the Debtors' EBITDAX which was derived based on NYMEX strip pricing as of a specific date (which necessarily is not the same date as the EBITDAX estimate for the peer companies published by various different analysts).  The result is an "apples to oranges" comparison.  This error indisputably renders TPH's comparable companies analysis unreliable.

56.     After incorporating these adjustments and others, the Stifel Rebuttal Reports states that by incorrectly deriving EBITDAX, "TPH is suppressing ~$230-340mm of value."  *Stifel Rebuttal Report*, at 33.

57.     <u>Draconian methodologies resulting in off-market valuations</u>.  The Stifel Rebuttal Report concludes that several aspects of TPH's analysis do not pass a "sanity check."  By way of example, Stifel takes issue with: (a) TPH running a discounted cash flow on just three years of data ███████████████████████████████ and applying a terminal multiple on year 4 adjusted EBITAX; (b) TPH's use of risk-adjusted discounted rates (RADRs) that assume acreage, already risked for reserve classification, loses ██████ of its value every two years development is delayed; (c) TPH's methodology that effectively values G&A at a ████████ multiple despite selecting a comparable company range between █████████ EBITAX; and (d) TPH's consideration of a post-tax NAV analysis despite the fact that the Debtors and its peers will not pay material cash taxes for years.

58.     <u>Irreconcilable values</u>.  The Stifel Rebuttal Report identifies a number of instances where Stifel cannot confirm the accuracy of TPH's values.  This is a serious issue according to the

Stifel Rebuttal Report since Stifel "should be able to corroborate TPH['s] values when running the same models on identical sets of assumptions."  *See* Stifel Rebuttal Report, at 5.

59.     The Stifel Report also highlights flaws with TPH's comparable companies analysis. The Stifel Rebuttal report observes that a "[c]omparable company analysis must be undertaken based on a company's asset base and operations."  *Stifel Rebuttal Report,* at 54.  Instead of following this practice, the Stifel Rebuttal Report states that for purposes of the TPH Report "TPH deliberately selected companies in out of favor basins such as the DJ Basin . . . to materially lower multiples." *Id.*  The peer set of comparable companies selected and utilized by TPH is "generally inconsistent with the public disclosure utilized in the valuation reports issued by TPH in the transaction with other Permian focused producers."  *Stifel Rebuttal Report*, at 60.

60.     Stifel, in contrast, focused on comparable companies in the Permian Basin in selecting its own comparable company set for purposes of the Stifel Report.  This is justified, according to Stifel, because the Debtors' "growth will be driven by oil and gas development in the Permian."  Companies in the Permian Basin trade "nearly 1x higher on a forward EBITAX basis than any other unconventional basin in the US."  *Id.* at 54.  As a result, TPH's improper selection of comparable companies that operate outside of the Permian Basin materially undervalued the Debtors.

61.     Due to the inherent unreliability of the TPH Report, the Court should rely on the Committee Expert Reports, which demonstrate, among other things, a significantly higher reorganized TEV of the Debtors and the flawed analysis by the Debtors' investment banker in preparing the Valuation Analysis attached to the Disclosure Statement.

**D.  The Committee Identifies Unencumbered Assets Of Significant Value.**

62.    As set forth in the *Motion Of The Official Committee Of Unsecured Creditors For Leave, Standing, And Authority To Prosecute Causes Of Action On Behalf Of The Debtors' Estates* [Docket No. 527] (the "**Committee Standing Motion**"), the Committee has identified numerous real property interests (the "**Challenged Leases**") that are not encumbered by valid, perfected and/or unavoidable liens.  The Committee Standing Motion attached a complaint which asserted claims against the Debtors' secured lenders seeking to avoid the liens asserted by the Debtors' secured lenders against the Challenged Leases for the benefit of the Debtors' estates.

63.    Hundreds of the assets identified by the Committee are in counties or states where the Debtors' secured lenders filed no liens of record.  In thousands of others, lien documents do not match the Debtors' own real property descriptions.  Yet, the Debtors made no disclosure of such deficiencies to the creditors to be bound by the Plan.   Though aware assets were unencumbered, the Debtors conducted no analysis of the value of unencumbered assets in the Disclosure Statement – to the contrary, Debtors represented to the creditors that "[t]he Company's obligations under the RBL Credit Agreement are secured by mortgages on a substantial portion of the Company's oil and natural gas properties…."[16]  If, as of the commencement of solicitation of votes, the Debtors knew they held unencumbered assets of significant but indeterminate value, the Debtors should have disclosed that fact in the Disclosure Statement.

64.    The Committee submits that the value of the Challenged Leases is greater than the value afforded to Holders of Class 5 Notes Claims under the Plan.  As a starting point, the Committee observes that the Proved Developed Producing (PDP) PV-10 value associated with the

---

[16]    Disclosure Statement (Docket #454) at IV(D)(1), p. 18.

548 Challenged Leases[17] is approximately ███████. *See Platt Sparks Report*, at § 1.4.10.

The total PV-10 value associated with the Challenged Leases is approximately ███████.[18]

65.     In response to the Committee's identification of the Challenged Leases, the Debtors

commissioned a report from Alvarez & Marsal North America, LLC ("**A&M**")[19] to assess the

value the Challenged Leases assuming, *arguendo*, the Committee's argument that the Challenged

Leases are unencumbered.  *See* Report of Jay Herriman & Seth Bullock, October 2019 (attached

hereto as **Exhibit E**) (the "**Unencumbered Value Report**").  The Unencumbered Value Report

concludes that the value (the "**Unencumbered Value**") of the Challenges Leases is between ████

████████████████████████████.

66.     Notably, the Unencumbered Value Report does not address whether the

Committee's discovery of significant Unencumbered Value impacts the Debtors' ability to

demonstrate that the proposed Plan satisfies the "best interests test" of Bankruptcy Code section

1129(a)(7) or the "fair and equitable test" of Bankruptcy Code section 1129(b).

67.     Accordingly, at confirmation, the Court should ask the Debtors:

- *Why did the Debtors decide not to disclose the possibility of significant unencumbered assets to their creditors prior to the Voting Deadline or the Confirmation Objection Deadline, even after the Committee identified the perfection deficiencies in the Committee Standing Motion?*

- *Why did the Debtors not discuss the possibility of this unencumbered value in the Liquidation Analysis attached as an exhibit to the Disclosure Statement?*

---

[17]     Leases may contain many parcels of real property, may coincide with a single parcel, or reside within only a part of a parcel.  Thus, there are thousands of parcels, but a smaller number of leases.

[18]     The Committee is unable to apportion PV-10 value between those portions of leases that are subject to challenge and those that are not because the required data has not been made available.

[19]     A&M is a consulting firm, but not a registered landman firm or title company.

## **OBJECTION**

**I.     The Plan Cannot Be Confirmed Because The Debtors Have
        Failed To Meet The Requirements Of Bankruptcy Code Section 1129(a).**

68.     To confirm a plan, the plan proponent bears the burden of proving by a preponderance of evidence that all of the requirements of Bankruptcy Code Section 1129(a) have been met.  *In re MCorp Fin., Inc.*, 137 B.R. 219, 225 (Bankr. S.D. Tex. 1992).  This burden is a heavy one and requires careful consideration of each of the relevant inquiries articulated by Bankruptcy Code section 1129.  *See In re Vita Corp.*, 380 B.R. 525, 528 (C.D. Ill. 2008); *In re Sacred Heart Hosp. of Norristown*, 182 B.R. 413, 423 (Bankr. E.D. Pa. 1995).  This is especially so where, as here, a debtor acts as the plan proponent.  *See, e.g., Everett v. Perez (In re Perez)*, 30 F.3d 1209, 1214 n.5 (9th Cir. 1994) ("The burden of proposing a plan that satisfies the requirements of the Code always falls on the party proposing it, but it falls particularly heavily on the debtor-in-possession or trustee since they stand in a fiduciary relationship to the estate's creditors.").

69.     As demonstrated below, the Debtors have failed to meet their burden of proving that the Plan satisfies all requirements of Bankruptcy Code Section 1129(a).

### **A.   The Debtors Cannot Satisfy Bankruptcy Code Section 1129(a)(1)
        Because The Plan Does Not Treat Class 5 Notes Claim Holders Equally.**

70.     Bankruptcy Code Section 1129(a)(1) provides that a plan cannot be confirmed unless it "complies with the applicable provisions of this title."  11 U.S.C. § 1129(a)(1).  One such "applicable provision" includes Bankruptcy Code Section 1123.  *See Matter of Cajun Elec. Power Co-op., Inc.*, 150 F.3d 503, 513, n.3 (5th Cir. 1998) ("Paragraph (1) [of § 1129(a)] requires that the plan comply with the applicable provisions of chapter 11, such as section 1122 and 1123, governing classification and contents of plan.") (quoting H.R. Rep. NO. 95–595, at 412 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6368).  Bankruptcy Code Section 1123(a)(4) provides that

a plan shall "provide the same treatment for each claim . . . of a particular class, unless the holder of a particular claim . . .agrees to a less favorable treatment of such particular claim. . ." 11 U.S.C. § 1123(a)(4).

71.     The law is clear that "if claims within the same class are not receiving the same treatment, and the holders of those claims being treated less favorably have not consented to the discrimination, the plan is not confirmable." *Schroeder v. New Century Liquidating Tr. (In re New Century TRS Holdings, Inc.)*, 407 B.R. 576, 592 (D. Del. 2009); *see also In re Star Ambulance Serv., LLC*, 540 B.R. 251, 260-61 (Bankr. S.D. Tex. 2015) (where plan "does not provide the same treatment for each claim or interest of a particular class . . . the Debtor has not established by a preponderance of the evidence that the requirements of § 1123(a)(4) are met"). "The key inquiry under § 1123(a)(4) is not whether all of the claimants in a class obtain the same thing, but whether they have the same opportunity." *In re Dana Corp.*, 412 B.R. 53, 62 (S.D.N.Y. 2008); *In re Breitburn Energy Partners LP*, 582 B.R. 321, 358 (Bankr. S.D.N.Y. 2018) (confirming plan in accordance with Bankruptcy Code section 1123(a)(4) where all class members "had the same opportunity to subscribe or not subscribe to the rights offering on the same terms.").

72.     Here, the Plan fails to satisfy this requirement with respect to Class 5 Notes Claims because the Plan confers significant benefits upon the Noteholder Backstop Parties that are not available to all other Holders of Class 5 Notes Claims.   Through the Rights Offering, the Noteholder Backstop Parties stand to receive: (i) an opportunity to purchase Rights Offering Shares at a discount to the Debtors' actual value (putting aside the Debtors' artificially low Plan value); (ii) a rights offering backstop fee; (iii) a Participation Premium; (iv) payment of the Ad Hoc Group's professionals fees; and (v) rights to designate one or more of the directors on the Reorganized Debtors' board of directors, among other corporate governance rights.   The Plan

limits participation in the Rights Offering to Accredited Investors, thus preventing participation in the Right Offering of numerous, non-Accredited Investor retail holders of the Class 5 Notes.

73.     Those that are expected to participate in the Rights Offering, namely the Class 5 Notes Claims Holders who are Noteholder Backstop Parties, have positioned themselves to receive substantially greater recoveries under the Plan – through participation in the Rights Offering – than holders of Class 5 Notes Claims that are not Noteholder Backstop Parties.  As to any Holder of a Class 5 Notes Claim that is not a Noteholder Backstop Party, such Holder is ineligible to receive the Noteholder Backstop Commitment Fee and the related Noteholder Backstop Commitment Fee Shares.  As to any Holder of a Class 5 Notes Claim that is an Eligible Holder but declines to participate in the Rights Offering, such Holder is ineligible to receive the Participation Premium Shares.  The Plan reallocates those Participation Premium Shares to those participating in the Rights Offering – principally, the Noteholder Backstop Parties. As to any Holder of a Class 5 Notes Claim that is not an Eligible Holder, the Plan denies such Holder the opportunity to participate in the Rights Offering and presumably purchase the Rights Offering Shares at a discount to Plan value.  The Plan reallocates the right to acquire those Rights Offering Shares to the Noteholder Backstop Parties.

74.     The Debtors, when faced with this argument by the Committee in its objection to approval of the Disclosure Statement, argued that the opportunities granted to the Noteholder Backstop Parties are on account of their commitments to the Rights Offering, rather than on account of their prepetition claims, and thus do not violate Bankruptcy Code section 1123(a)(4). *See Debtors' Reply In Support Of Disclosure Statement And Solicitation Procedures Motion* [Docket No. 456] at ¶ 26.  The Debtors' argument is directly contradictory to their own Disclosure Statement and Plan, which specifically include the benefits of the Rights Offering in describing

the "treatment" of Class 5 Notes Claims.  *See* Disclosure Statement at 6 (noting under "treatment of Claim/Equity Interest" that "Qualified Noteholders will receive Subscription Rights to participate in the Rights Offering"); Disclosure Statement at 9 (including potential value of Participation Premium Shares in calculating "Projected Recovery Under the Plan"); Disclosure Statement at 33 (describing the Rights Offering under the "Treatment of Claims and Interests" on the Class 5 Notes Claims); Plan at 26-27 (same).  Moreover, the Debtors' inclusion of the Rights Offering materials with the Solicitation Packages sent to holders of Class 5 Notes Claims demonstrates their intent that the Subscription Rights are part and parcel to the treatment of claims under the Plan.

75.     Granting these special opportunities to certain holders of Class 5 Notes Claims and not others violates a fundamental tenant of bankruptcy law − that similarly situated creditors receive similar treatment. *In re Schimmelpenninck*, 183 F.3d 347, 359 (5th Cir. 1999) (recognizing bankruptcy code policy that "ensuring equal distribution of that property to similarly situated creditors should remain a paramount concern."); *In re Superior Tomato-Avocado, Ltd.,* 481 B.R. 866, 872 (Bankr. W.D. Tex. 2012) (stating that "the fundamental purpose of the Bankruptcy Law ... is, equality between creditors") (citing *Clarke v. Rogers,* 228 U.S. 534, 544, 33 S.Ct. 587, 57 L.Ed. 953 (1913)).  Offering certain Class 5 claimants preferred opportunities to invest in a rights offering is precisely the situation that Bankruptcy Code Section 1123(a)(4) is designed to protect. *See, e.g.*, *In re Washington Mut., Inc.*, 442 B.R. 314, 360 (Bankr. D. Del. 2011) (denying confirmation under Bankruptcy Code Section 1123(a)(4) where rights offering was only offered to holders of claims above a certain value, recognizing that "[t]he right to buy into a company does have inherent value; it includes the 'upside' if the company is successful.").

76.     The value diverted under the Plan to the Noteholder Backstop Parties through the Rights Offering represents additional distribution to select holders of the Class 5 Notes Claims that is unavailable to many of the Holders of the Class 5 Notes Claims that are not Noteholder Backstop Parties.  This disparate treatment renders the Plan unconfirmable under Bankruptcy Code sections 1123(a)(4) and 1129(a)(1).

**B.  The Debtors Cannot Satisfy Bankruptcy Code Section 1129(a)(2) Because The Debtors Failed To Properly Solicit Class 5 Notes Claims.**

77.     Bankruptcy Code section 1129(a)(2) provides that a plan cannot be confirmed unless "[t]he proponent of the plan complies with the applicable provisions of this title." 11 U.S.C. § 1129.  Case law and legislative history show that the principal purpose of Bankruptcy Code section 1129(a)(2) is to assure that plan proponents have complied with the disclosure and solicitation requirements under Bankruptcy Code sections 1125 and 1126.  *See In re Drexel Burnham Lambert Grp., Inc.*, 138 B.R. 723, 759 (Bankr. S.D.N.Y. 1992) ("The legislative history to § 1129(a)(2) explains that this provision embodies the disclosure and solicitation requirements under §§ 1125 and 1126.") (citing H.R.Rep. No. 595, 95th Cong., 1st Sess. 412 (1977); S.Rep. No. 989, 95th Cong., 2d Sess. 126 (1978), U.S.Code Cong. & Admin.News 1978, p. 5787); *In re City of Colorado Springs Spring Creek Gen. Imp. Dist.*, 177 B.R. 684, 688 (Bankr. D. Colo. 1995) ("Section 1129(a)(2) generally requires the proponent of a plan to comply with applicable provisions of Title 11 in order to have its plan confirmed.  These include § 1126 which governs acceptance of a plan and § 1125 which sets out the requirements for disclosure statements.").  "The expression of acceptance or rejection of a plan is not a meaningless exercise and the right to vote should not be abrogated in the interest of expediency." *In re Jeppson*, 66 B.R. 269, 294 (Bankr. D. Utah 1986) (denying plan confirmation where debtor failed to properly solicit acceptances or rejections from holders of claims).

78.     Applying Bankruptcy Code section 1126, courts have denied confirmation for failure to properly solicit acceptances and rejections of plans to beneficial holders of claims. *See, e.g.*, *In re Southland Corp.,* 124 B.R. 211 (Bankr. N.D. Tex. 1991) (denying confirmation and requiring re-solicitation where it was unclear whether ballots had been cast by beneficial owners or record holders); *City of Colorado Springs Spring Creek Gen. Improvement Dist.,* 177 B.R. 684, 691 (Bankr.D.Colo.1995) (confirmation denied where debtor failed to show that disclosure had been provided to all beneficial holders in a pre-petition solicitation); *In re Pioneer Fin. Corp.*, 246 B.R. 626, 636 (Bankr. D. Nev. 2000) (denying confirmation where solicitation to beneficial holders was inadequate). Here, the Debtors cannot satisfy Bankruptcy Code section 1126, and, therefore, Bankruptcy Code section 1129(a)(2), because voting on the Plan was not appropriately solicited from members of Class 5 Notes Claims.

79.     Specifically, the Debtors failed to include a pre-addressed, postage prepaid return envelope with the Solicitation Packages or even a return address for Beneficial Holders to return their completed ballots as ordered by the Court. The Debtors' excuse for the solicitation nightmare experienced by Beneficial Holders: we do not control the Nominees. Nowhere in the Solicitation Procedures Order does it permit the Debtors to delegate responsibility for their requirement to comply with the Solicitation Procedures Order onto the Nominees.

80.     Undoubtedly, if the Debtors consulted with their Voting Agent, KCC, it would have informed the Debtors that their chosen approach of soliciting through the "reorganization departments" would not comply with the requirements of the Solicitation Procedures Order. Further, the Voting Agent should have informed the Debtors that individual retail holders (which numbered in the hundreds or thousands) would encounter significant challenges casting their ballot without a return envelope, return address or readily apparent directions from their broker for voting

on the Plan.  Either the Debtors did consult and ignored the advice or did not consult and simply directed the Voting Agent to violate the Solicitation Procedures Order.  Either way, the Debtors cannot be found to satisfy Bankruptcy Code section 1129(a)(2).

81.     Once called on their errors by the Committee, in an apparent effort to seek the Court's mercy for the Debtors' solicitation defects and deviations from the Solicitation Procedures Order, the Debtors cite to other instances where their Voting Agent solicited votes through the Nominee's reorganization department instead of the proxy departments.  *See Debtors' Objection To The Emergency Motion Of The Official Committee Of Unsecured Creditors For Order (I) (A) Compelling Debtors To Comply With Solicitation Procedures Order And (B) Extending Voting Deadline With Respect To Debtors' Proposed Chapter 11 Plan And/Or (II) Granting Equitable Relief Deeming Class 5 Notes Claims To Reject The Plan* [Docket No. 602] (the "**Debtors' Solicitation Response**"), at ¶ 15.  However, many of the cases cited by KCC are readily distinguishable or support the Committee's proposition that solicitation through the reorganization departments suppresses voting by retail holders of publicly traded securities.

82.     Finally, the Debtors claim that inclusion of the Rights Offering materials with the Solicitation Packages was proper because the "Rights Offering Materials are directly related to the rights of Holders of Class 5 Notes Claims under the Plan, and were approved by the Bankruptcy Court in the Solicitation Procedures Order."  *Id.* at ¶ 14.  Yet, the Debtors adamantly refuse to acknowledge that stuffing the Solicitation Packages with additional materials might lead to voter confusion.  They also cannot point to a single provision of the Solicitation Procedures Order that contemplated inclusion of the Rights Offering materials **in the very same mailing** as the Solicitation Package despite the clear identification of the Solicitation Package contents in the

Solicitation Procedures Order and the Voting and Solicitation Procedures.   The inclusion of these materials was another impermissible deviation from the Solicitation Procedures Order.

83.     For these reasons, the Court should deny confirmation of the Plan for failure to properly solicit votes in accordance with Bankruptcy Code section 1126 and compliance with Bankruptcy Code section 1129(a)(2).

### C.  The Debtors Cannot Satisfy Bankruptcy Code Section 1129(a)(3) Because The Plan Has Not Been Proposed In Good Faith.

84.     Bankruptcy Code section 1129(a)(3) requires that a plan be "proposed in good faith and not by any means forbidden by law" in order to be confirmed.  *See* 11 U.S.C. 1129(a)(3). Essentially, Section 1129(a)(3)'s concept of good faith "is intended to allow courts to utilize their gut feeling about a plan's effects":

> Sometimes a bankruptcy judge's nose tells him/her that something doesn't smell right and further inquiry is warranted . . . Sometimes, a bankruptcy judge's stomach may turn, when he/she is preparing to sign a particular judgment or order.  This queasiness is reflective of the judge's sense that for some, perhaps inarticulable, reason, it just isn't right to grant the relief requested.  In the context of plan confirmation in bankruptcy cases, when this is the way the judge feels, it may be because the plan has not 'been proposed in good faith.'  In short, the reading of the law should be tempered by the judge's sense of equity-what is just in the circumstances of the case. If there are objective facts to support this feeling, perhaps the plan should not be confirmed.

See *In re Dow Corning Corp.*, 244 B.R. 673, 676 (Bankr. E.D. Mich. 1999) (quoting *In re Timko*, No. 87-09318 (Bankr. E.D. Mich. July 22, 1988) (unpublished)).

85.     Good faith must be viewed in light of the totality of the circumstances surrounding establishment of a Chapter 11 plan.  *In re Sun Country Dev., Inc.,* 764 F.2d 406, 408 (5th Cir. 1985).  To be proposed in good faith, a plan must fairly achieve a result consistent with the Code. *Matter of Block Shim Dev. Co.-Irving*, 939 F.2d 289, 292 (5th Cir. 1991) (citing *Madison Hotel Associates,* 749 F.2d 410, 425 (7th Cir.1984)).  Generally, "[w]here [a] plan is proposed with the

legitimate and honest purpose to reorganize and has a reasonable hope of success, the good faith requirement of § 1129(a)(3) is satisfied." *In re Vill. at Camp Bowie I, L.P.*, 710 F.3d 239, 247 (5th Cir. 2013) (quoting *In re T-H New Orleans P'ship*, 116 F.3d 790, 802 (5th Cir. 1997)).  However, "[u]ltimately, the § 1129(a)(3) inquiry is fact-specific, fully empowering the bankruptcy courts to deal with chicanery." *Id*. at 248.

86.     A plan cannot comply with the "good faith" principle if it deprives parties-in-interest of their due value entitlements, reallocates such entitlements to favored stakeholders, and/or otherwise over-compensates such preferred parties.  *See, e.g.*, *In re Quigley Co., Inc.*, 437 B.R. 102 (Bankr. S.D.N.Y. 2010) (plan process benefitting certain preferred creditors to the detriment of others not proposed in "good faith"); *In re Bush Indus., Inc.*, 315 B.R. 292 (Bankr. W.D.N.Y. 2004) (plan that included preferred treatment for an insider violated "good faith" requirement); *In re Greate Bay Hotel & Casino, Inc.*, 251 B.R. 213, 240 (Bankr. D. N.J. 2000) ("Of course, the classification and treatment of classes of claims is always subject to the good faith requirements under § 1129(a)(3).").

87.     Here, the circumstances surrounding the negotiation and filing of the Plan suggest that the Plan was not filed with legitimate reorganization purposes in mind.  Rather, the Plan is designed to improperly enrich GSO − an entity with close ties to the Debtors' board of directors dating well before the Petition Date.  Through GSO's close affiliations with the Debtors' and their board of directors, GSO was able to exert its leverage to secure support of the Global RSA. Through the Global RSA, GSO stands to receive: (i) approximately 87% of the reorganized Debtors' common equity; (ii) the right to appoint five members of the reorganized Debtors' board of directors, not including the appointment of Westcott, a former principal of GSO; and (iii) the right to invest in the reorganized Debtors at a significant discount and receive related premiums

and backstop fees.  If Westcott succeeds in delivering the Debtors to GSO, then (i) his employment agreement as CEO will be assumed by the reorganized Debtors, (ii) he will share in the 5% of reorganized equity allocated under the MIP which he expects will make him rich;[20] and (iii) he will continue to serve on the board of directors.

88.     As discussed herein, GSO's outsized recoveries and benefits awarded under the Plan are backed by a total enterprise value manufactured to achieve that result.  Accordingly, the Plan does not "fairly achieve a result consistent with the Code," *Block Shim Dev. Co.-Irving*, 939 F.2d at 292, and therefore, cannot be confirmed.

**D.  The Debtors Cannot Satisfy Bankruptcy Code**
   **Section 1129(a)(7) Because Class 5 Notes Claim Holders**
   **Will Receive Less Than They Would Under A Chapter 7 Liquidation.**

89.     The Court must deny confirmation of the Plan because it fails to provide Class 5 Notes Claims with the value they would receive in a hypothetical chapter 7 liquidation.  To confirm a plan, Bankruptcy Code section 1129(a)(7) requires that each holder of a claim in an impaired class must either accept the plan or must "retain under the plan on account of such claim . . . property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7."  11 U.S.C. § 1129(a)(7).   This provision, commonly referred to as the best interest test, "ensures that reorganization is in the best interest of individual claimholders who have not voted in favor of the plan." *In re Cypresswood Land Partners, I*, 409 B.R. 396, 428 (Bankr. S.D. Tex. 2009) (citing *Bank of Am. Nat. Trust & Sav. Ass'n v. 203 N. LaSalle Street P'ship*, 526 U.S. 434, 441 n.13 (1999)).

---

[20]     The MIP awards are on top of the over $28 million in compensation members of the board of directors and the management team received in the one year prior to the Petition Date.  *Id.* at 203:24 – 205:18.

90.     A plan of reorganization "may not be confirmed where the evidence is not sufficient on which to base an independent factual determination that the proposed plan is in the best interests of the creditors pursuant to § 1129(a)(7)." *In re MCorp Fin., Inc.*, 137 B.R. 219, 228 (Bankr. S.D. Tex. 1992); *see also In re Cantu*, 784 F.3d 253, 262 (5th Cir. 2015) ("A reorganization plan must either be accepted by each creditor or satisfy the Code's 'best interests of the creditor' rule, which requires that the holder of a claim receive under the reorganization plan at least as much as the holder would receive in the event of a chapter 7 liquidation").  The best interests test applies to individual creditors holding impaired claims, even if the class as a whole votes to accept the plan. *See Bank of Am. Nat'l Tr. & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 441 n.13 (1999).

91.     As will be shown at trial, in a Chapter 7 liquidation, Class 5 Notes Claims would recover in excess of the projected 2.0% - 3.0% recovery set forth in the Disclosure Statement.  The nominal value allocated to Class 5 Notes Claims fails to take into account the significant proceeds Class 5 Notes Claims might realize upon the liquidation of the Challenged Leases in a chapter 7 liquidation.   Accordingly, the Plan violates the best interests test of Bankruptcy Code section 1129(a)(7) and cannot be confirmed.

92.     The liquidation analysis (the "**Liquidation Analysis**"), attached as Exhibit D to the Disclosure Statement, reaches the conclusion that Class 5 Notes Claims are not entitled to any recovery under a hypothetical chapter 7 liquidation.  However, the Liquidation Analysis makes no mention of the Challenged Leases and their associated Unencumbered Value.  To substantiate the Liquidation Analysis, the Debtors commissioned the expert report of Seth Bullock entitled "Hypothetical Liquidation Analysis – October 2019" (the "**A&M Liquidation Report**").  Despite issuing the A&M Liquidation Analysis and the Unencumbered Value Report simultaneously, the A&M Liquidation Report inexplicably disregards the Challenged Leases and their associated

Unencumbered Value.  Because it makes no mention of the Unencumbered Value, the A&M Liquidation Report does not opine on the impact the Unencumbered Value may have on distributions to Class 5 Notes Claims in a hypothetical chapter 7 liquidation.[21]

93.      In sum, the Debtors have failed to meet their burden that the Plan satisfies the "best interests test" of Bankruptcy Code section 1129(a)(7).  Accordingly, the Plan cannot be confirmed.

### E.  The Debtors Cannot Satisfy Bankruptcy Code Section 1129(a)(11) Because The Plan Is Not Feasible.

94.      Bankruptcy Code section 1129(a)(11) codifies the feasibility requirement and requires a demonstration by the plan proponent that "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan."  11 U.S.C. § 1129(a)(11).  This feasibility standard requires a court to consider whether the plan offers a reasonable probability of success.  *Fin. Sec. Assurance Inc. v. T-H New Orleans Ltd. P'ship (In re T-H New Orleans Ltd. P'ship)*, 116 F.3d 790, 801 (5th Cir. 1997).  In other words, "§ 1129(a)(11) requires a debtor to show that it can accomplish what it proposes to do, in the time period allowed, on the terms set forth in the plan."  *In re Star Ambulance Serv., LLC*, 540 B.R. 251, 266 (Bankr. S.D. Tex. 2015); *see In re CRB Partners, LLC*, No. 11-11924, 2013 WL 796566, at *7 (Bankr. W.D. Tex. Mar. 4, 2013) ("One purpose of the feasibility test is to weed out plans that promise more than debtors can deliver.").  If a plan cannot possibly satisfy claims in the manner proposed, it cannot be confirmed.  *See In re Two Streets, Inc.*, 597 B.R. 309, 317 (Bankr.

---

21 ██████████████████████████████████████████████████████████████████ ██████ However, the Debtors have not conducted a true expert valuation of the Challenged Leases.  In any case, the Liquidation Analysis does not mention any significant unencumbered assets.  Furthermore, the Committee believes that the value of the Challenged Leases would be available to Holders of Class 5 Notes Claims based upon provisions of the Final DIP Order intended to accomplish this.

S.D. Miss. 2019) (denying confirmation where debtor failed to provide evidence that it could pay administrative, priority, and adequate protection claims within timeframe proposed in plan).

95.     The Plan provides that each Holder of an Allowed General Unsecured Claim against the Debtors shall receive, at the option of the applicable Debtor, either (i)  payment in full in Cash  in  the ordinary  course of business of the  Debtors and Reorganized  Debtors;  or  (ii) Reinstatement on the Effective Date.  *See* Plan at Art. III.B.6.   The Debtors project *pro forma* liquidity of approximately $141 million on the emergence date.  *See* Financial Projections attached as Exhibit E to the Disclosure Statement.  The treatment of Class 6 General Unsecured Claims raises obvious concerns of the feasibility of the Plan if Allowed claims exceed the Debtors' estimates of between $2 - $4 million of allowed Class 6 General Unsecured Claims.

96.     Pursuant to the Court's Order *(I) Establishing Bar Dates for Filing Proofs of Claim, (II) Approving the Form and Manner of Filing Proofs of Claims, and (III) Approving Notice Thereof* [Docket No. 444], the last date for non-governmental units to file proofs of claim in these Chapter 11 cases passed on October 14, 2019.  As noted in the *Debtors' Reply to the Objection of the Official Committee of Unsecured Creditors to Debtors' Motion for Entry of an Order to Extend Their Exclusive Periods to File a Chapter 11 Plan and Solicit Acceptances Thereof* [Docket No. 636] (the "**Exclusivity Reply**"), over "1,793 proofs of claim have been filed in amounts totaling over **$7.1 billion**." (emphasis added).  This stands in remarkable contrast to the estimate of $2 - $3 million of allowed Class 6 General Unsecured Claims pursuant to the Disclosure Statement. *See Disclosure Statement* at 9.

97.     In response to the staggering face amount of claims identified by the Debtors in the Exclusivity Reply, the Committee conducted a preliminary reconciliation of the proofs of claim filed in these cases.  Many of the asserted proofs of claims are redundant claims filed against each

of the Debtors in these chapter 11 cases.  That being said, after backing out those claims, there remains approximately $1.6 billion of non-redundant, non-duplicative claims asserted by holders of royalty and/or working interests, insurers, personal injury and class action claimants.  The table below summarizes the asserted liabilities against the Debtors.  A listing of the claims in question asserted in an amount greater than $500,000 is attached hereto as **Exhibit F**.

**Legacy Reserves**
**Summary of Proof of Claims**

*($ in millions)*

| Basis | Number of Claims[1] | Aggregate Claim Amount[1] |
|---|---|---|
| Royalty / Working Interests | 17 | $ 1,607.3 |
| Surety Bonds / Indemnity Claims | 1 | 6.2 |
| Personal Injury / Class Action Claims | 2 | 13.1 |
| **Total Claims > $500K** | **20** | **$ 1,626.6** |
| Proof of Claims < $500K | 535 | 16.2 |
| **Total** | **555** | **$ 1,642.8** |

(1)  Identical claims filed against multiple Debtor entities and claims by similar claimants for identical amounts are considered duplicative. Such claims are excluded in this analysis.

98.     Claimants have also asserted hundreds more unliquidated claims against the Debtors.

99.     Notably, even if the Debtors assert that none of these claims are valid or the proper allowed amount is far less than the amount asserted, the fact remains that none of these claims are subject to an objection by the Debtors or a motion to estimate for purposes of establishing feasibility of the Plan.  Absent such an objection or estimation motion, the Court should assume that these claims will be allowed as filed.  *See* 11 U.S.C. 502(a).

100.     If allowed as filed, the Debtors' projections demonstrate that they will not have sufficient liquidity to pay these claims absent further reorganization or liquidation.  Moreover, the Plan does not provide for the funding of a reserve to pay these claims upon allowance in the event

the Debtors experience a liquidity shortfall.   Thus, the Plan fails to satisfy the feasibility requirement of Bankruptcy Code section 1129(a)(11).

## II.   The Plan Cannot Be Confirmed Because It Is Not Fair And Equitable To Holders Of Class 5 Notes Claims.

101.   Bankruptcy Code section 1129(b)(1) provides that if all confirmation requirements of section 1129(a) are met other than section 1129(a)(8), the court "shall confirm the plan notwithstanding the requirements of [section 1129(a)(8)] if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan."  11 U.S.C. § 1129(b)(1).  Bankruptcy Code section 1129(b)(2)(B), in turn, describes examples of how a plan may be "fair and equitable" to a class of impaired, non-accepting general unsecured claims. 11 U.S.C. §1129(b)(2)(B).

102.   Class 5 Notes Claims did not vote to accept the Plan by the margins required under Bankruptcy Code section 1126(c).   Accordingly, the Debtors will be required to satisfy the requirements of Bankruptcy Code section 1129(b) – the "cramdown requirements" – as to Class 5 Notes Claims.

### A.   The Stifel Report Establishes That The Plan Is Not "Fair And Equitable" Because It Provides Value To Holders Of Class 4 Term Loan Claims In Excess of The Value Of Their Claims

103.   Under this subsection, the "fair and equitable" standard "can be seen to have at least two key components: the absolute priority rule; and the rule that no creditor be paid more than it is owed." 7 Collier on Bankruptcy ¶1129.03[4][a].  Multiple courts have held that in order for a plan to be "fair and equitable," a class of creditors may not receive more than 100% of its claim. *See, e.g., In re MCorp Fin., Inc.*, 137 B.R. 219, 235 (Bankr. S.D. Tex. 1992) ("[A] dissenting class should be assured that no senior class receives more than 100 percent of the amount of its claims . . . The safeguards that no claim or interest receive more than 100 percent of the allowed amount

of such claim . . . will insure that the plan is fair and equitable"); *In re Idearc, Inc.*, 423 B.R. 138, 170 (Bankr. N.D. Tex. 2009) ("The corollary of the absolute priority rule is that senior classes cannot receive more than a one hundred percent (100%) recovery for their claims.") (citing *In re Granite Broad. Corp.*, 369 B.R. 120, 140 (Bankr. S.D.N.Y. 2006); *In re Genesis Health Ventures, Inc.*, 266 B.R. 591, 612 (Bankr. D.Del. 2001); *In re Victory Constr. Co.*, 42 B.R. 145, 155 (Bankr. C.D. Cal. 1984)).

104.     The reorganized Debtors' TEV impacts whether the treatment of unsecured creditors under the Plan is fair and equitable.  As the Plan proponent, it is the Debtors' burden to prove by a preponderance of the evidence that the Plan does not afford any class of creditors value in excess of their claims amounts.  *See Heartland Fed. Sav. & Loan Ass'n v. Briscoe Enters., Ltd. (In re Briscoe Enters., Ltd.)*, 994 F.2d 1160, 1165 (5th Cir. 1993) ("[P]reponderance of the evidence is the debtor's appropriate standard of proof both under [Section] 1129(a) and in a cramdown.").

105.     The Plan fails to satisfy the "fair and equitable" requirement on this basis based upon the valuation analysis prepared by Stifel.  The Plan proposes to convert $351 million of Class 4 Term Loan Claims into approximately 52% of the New Common Stock of the Reorganized Debtors.  Based upon the mid-point TEV arrived at by Stifel of approximately $1,160 million, this reflects equity value worth approximately $603 million.  This results in a distribution to holders of Class 4 Term Loan Claims of approximately 72% more than their Allowed Claim under the Plan (which includes the partial allowance of an impermissible makewhole payment).  Such treatment violates the Bankruptcy Code's "fair and equitable" requirement, especially where, as here, Class 5 Notes Holders are slated to receive a nominal recovery.

106.    By providing secured creditors a windfall at the expense of unsecured creditors, the Plan violates the corollary to the absolute priority rule.  *See MCorp Fin.*, 137 B.R. at 235.  The confirmation of the Plan must therefore be denied.

**B.  The Plan Improperly Allocates Value Of Unencumbered Assets To Secured Creditors.**

107.    Assuming, *arguendo*, that the total enterprise valuation offered by the Debtors is correct, the Debtors still fail to satisfy the fair and equitable requirement of Bankruptcy Code Section 1129(b)(1).   Bankruptcy Code section 1129(b)(2) sets forth a non-exhaustive list of minimum requirements in order for a plan to be fair and equitable.  *See* 11 U.S.C. § 1129(b)(2) ("For the purpose of this subsection, the condition that a plan be fair and equitable with respect to a class *includes* the following requirements …") (emphasis added).  As the Fifth Circuit has held:

> [T]echnical compliance with all the requirements in § 1129(b)(2) does not assure that the plan is "fair and equitable." . . . Section 1129(b)(2) sets minimal standards plans must meet.  However, it is not to be interpreted as requiring that every plan not prohibited be approved.  A court must consider the entire plan in the context of the rights of the creditors under state law and the particular facts and circumstances when determining whether a plan is "fair and equitable."

*See In re D & F Construction Inc.*, 865 F.2d 673, 675 (5th Cir.1989) (citations removed).

108.    Additional factors analyzed in determining whether a plan is fair and equitable include *"whether, for an unsecured class, the percentage or formula for proposed payment demonstrates a good faith effort to repay those obligations"* and "whether other particular inequities exist, including special prejudice to a dissenting class arising from its particular circumstances."  *In re Montgomery Court Apartments of Ingham Cty., Ltd.*, 141 B.R. 324, 346 (Bankr. S.D. Ohio 1992); *see also In re EFH Grove Tower Assocs.*, 105 B.R. 310, 313 (Bankr. E.D.N.C. 1989) (In addition to the requirements of Bankruptcy Code Section 1129(b)(2), "[t]o be 'fair and equitable' under § 1129(b)(1) a plan must *literally* be fair and equitable.") (emphasis added).

109.    In contrast to a plan that is "fair and equitable," the Plan is premised on the Debtors' belief that their secured lenders are entitled to all of the Debtors' going concern value even though the Committee has identified significant Unencumbered Value.  In reality, though, there should be two "value waterfalls."  One of these value waterfalls is tied to assets.  The second waterfall "consists of unencumbered assets, as well as the going-concern and other value of the firm that Chapter 11 preserves."  Melissa B. Jacoby & Edward J. Janger, *Tracing Equity:  Realizing and Allocating Value in Chapter 11*, 96 Tex. L. Rev. 673, 673.  It stands to reason that "asset-based creditors [(*i.e.*, secured creditors)] take priority over non-asset-based creditors only to the extent of the specific assets that their liens encumber."  *Id.* at 689.  In contrast, "unsecured creditors' claims are value-based – against the value of the firm not represented by encumbered assets."  *Id.* Accordingly, "for secured creditors, their payment priority is based on, and limited to, the value of their collateral on the effective date of the plan – not the value of the firm."  *Id.* at 690.

110.    When a secured lender, such as a Term Loan Lender in these cases, is undersecured, such lender "becomes both an asset-based and a firm-based creditor:  it has an allowed secured claim plus an unsecured deficiency claim."  *Id.* at 690-91.  However, "[n]othing in state law or the Bankruptcy Code gives a deficiency claim priority over the claims of other unsecured creditors in the value of the firm, and to do so would be neither fair nor equitable."  *Id.*  Yet, this is exactly what the Plan proposes to do.

111.    Here, the Plan improperly allocates value to holders of the Term Loan Claims on account of assets that are not encumbered by their liens (*i.e.*, the Challenged Leases).  As outlined in the Committee Standing Motion and validated by the Unencumbered Value Report, the Debtors' estates hold significant unencumbered assets.  Consistent with the requirement that a plan be "fair and equitable," the Plan should allocate the Unencumbered Value to unsecured creditors.

112.     For present purposes, the Committee accepts the Unencumbered Value Report's

conclusion that the midpoint Unencumbered Value represented by the Challenged Leases is ███

████.  This value should translate to recovery of approximately ██████ (before dilution by any

rights offering).  The disparity between the Unencumbered Value and the 2 to 3 cents offered to

Class 5 Notes Claims clearly demonstrates that, in contravention of the Bankruptcy Code, the Plan

proposes to elevate the priority of the Term Loan Lenders' deficiency claim over the claims of the

Class 5 Notes Claims.  Accordingly, the Plan is not fair and equitable and cannot be confirmed.

## III.   THE SETTLEMENTS ENCOMPASSED IN THE PLAN DO NOT SATISFY THE ELEMENTS OF RULE 9019 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE

113.     The compromises embodied in the Plan fails to meet the tests of Fed. R. Bankr. P.

9019 as required by Title XI.  The Plan proposes, *inter alia*, the following compromise:

> As discussed in detail in this Disclosure Statement and as otherwise provided in the
> Plan, pursuant to Section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019,
> and in consideration for the classification, distributions, releases, and other benefits
> provided under the Plan, upon the Effective Date, the provisions of the Plan shall
> constitute a good faith compromise and settlement of all Claims and Interests
> controversies resolved pursuant to the Plan, including (1) any challenge to the
> amount, validity, perfection, enforceability, priority or extent of the DIP Claims,
> RBL Claims, Term Loan Claims, or the Notes Claims and (2) any claim to avoid,
> subordinate, or disallow any DIP Claim, RBL Claim, Term Loan Claim, or Notes
> Claim, whether under any provision of chapter 5 of the Bankruptcy Code, on any
> equitable theory (including equitable subordination, equitable disallowance, or
> unjust enrichment) or otherwise. . . .

Disclosure Statement at VII(C)(1), p, 38.

114.     Bankruptcy Rule 9019, has a "clear purpose . . . to prevent the making of concealed

agreements which are unknown to the creditors and unevaluated by the court." *In re Masters, Inc.*,

141 B.R. 13, 16 (Bankr.  E.D.N.Y. 1992).   The Court must make an informed and independent

judgment as to whether a proposed compromise is "fair and equitable" after apprising itself of "all

facts necessary for an intelligent and objective opinion of the probabilities of ultimate success

should the claim be litigated." *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968).  The *TMT Trailer* factors are well known, as is the requirement of adequate notice.  Notice is required of the material facts, in public.  See, *In re Taylor*, 59 B.R. 176 (Bankr. S.D. Tex. 1986) (secret compromise rejected because creditors are entitled to notice of the issues).  While notice of the compromise can be shortened and waived in exigent circumstances where notice cannot be timely provided[22], no such exigent circumstances exist here.

115.    Here, Rule 9019 requires that the creditor body receive notice of the *bona fides* of the issues being compromised.  The Debtors have not provided notice of the lien challenge issues that they propose to compromise (though they had adequate opportunity to do so).  The Debtors have not told the creditors that the compromise and release of the avoidance actions could encompass ███% of the Debtors' net acreage, the dollar value they attribute to the dispute, or the reasons for settling the dispute.  The entire creditor body should receive notice and an opportunity to object to any compromise.

116.    Real notice entails an outline of the *TMT Trailer* factors so all creditors can form an opinion on the wisdom of the proposed compromise.  A compromise that does not disclose the relevant facts, or that improperly or inaccurately describes the facts, should not be approved.

117.    Additionally, the Court should give deference to the paramount interest of creditors who are *not* self-interested in the compromise.  *Matter of Cajun Elec. Power Coop., Inc.*, 119 F.3d 349, 356 (5th Cir. 1997); *In re Foster Mortg. Corp.*, 68 F.3d 914, 917 (5th Cir. 1996); *In re Justice*

---

[22]    Notice for a Rule 9019 motion can only be waived in truly exigent circumstances and, when due process is violated, the lack of notice is reviewable de novo.  *Yang Jin Co. v. Miller (In re Kong)*, No. CC-15-1371-KiTaL, 2016 Bankr. LEXIS 2209, at *21 (B.A.P. 9th Cir. June 6, 2016) ("While bankruptcy courts have discretion to reduce or eliminate the notice period for settlements or compromises, that discretion is limited.")

*Oaks II, Ltd.*, 898 F.2d 1544, 1549 (11th Cir. 1990); *In re Flight Transp. Corp. Sec. Litig.*, 730 F.2d 1128, 1135 (8th Cir. 1984).

118.    Finally, the Committee does not agree that the compromise within the Plan reflects a proper exercise of business judgment.  Before the Debtors were aware of the issues affecting a significant number of parcels, they agreed to compromise all avoidance actions for no value.  Now, aware of the details, the Debtors are not seeking additional compensation for the release of valuable claims and causes of action.

119.    As a central element of the Plan, because the aforementioned compromise cannot be approved under Rule 9019, neither can the Court confirm the Plan as proposed by the Debtors.

## CONCLUSION

W**HEREFORE**, for the reasons discussed herein, the Committee respectfully requests that this Court: (i) sustain this Objection; (ii) deny confirmation of the Plan; and (iii) grant to the Committee such other and further relief as the Court may deem just, proper and equitable.

Dated: October 28, 2019
      Houston, Texas

                                     Respectfully submitted,
                                     By: */s/ Hugh M. Ray, III*

                                   **PILLSBURY WINTHROP SHAW PITTMAN LLP**
                                   Hugh M. Ray, III (State Bar No. 24004246)
                                   William J. Hotze (State Bar No. 24087754)
                                   Two Houston Center
                                   909 Fannin, Suite 2000
                                   Houston, TX 77010-1028
                                   Telephone: (713) 276-7600
                                   Email: hugh.ray@pillsburylaw.com
                                                 william.hotze@pillsburylaw.com

                                   - and -

                                   **BROWN RUDNICK LLP**
                                   Robert J. Stark (admitted *pro hac vice*)
                                   Bennett S. Silverberg (admitted *pro hac vice*)
                                   Andrew M. Carty (admitted *pro hac vice*)
                                   Uchechi Egeonuigwe (admitted *pro hac vice*)
                                   Seven Times Square
                                   New York, NY 10036
                                   Telephone: 212-209-4800
                                   Email:   rstark@brownrudnick.com
                                   bsilverberg@brownrudnick.com
                                   acarty@brownrudnick.com
                                   uegeonuigwe@brownrudnick.com

                                   -and -

                                   Jeffrey L. Jonas (admitted *pro hac vice*)
                                   James Stoll (*pro hac vice* pending)
                                   One Financial Center
                                   Boston, MA 02111
                                   Telephone: 617-856-8200
                                   Email:   jjonas@brownrudnick.com

                                   *Counsel for the Official Committee of Unsecured Creditors*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on October 28, 2019, a true and correct copy of the foregoing was served via email through the Bankruptcy Court's Electronic Case Filing System on the parties that have consented to such service.


<u>*/s/ Hugh M. Ray, III*            </u>
Hugh. M. Ray, III