## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS HOUSTON DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| | Case No. 19-33395 (MI) |
| LEGACY RESERVES INC., *et al.*,[1] | (Jointly Administered) |
| Debtors. | |

## THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS'
## BRIEF ON EMPLOYEE RELATED PAYMENTS TO INSIDERS

The Official Committee of Unsecured Creditors (the "**Committee**") submits this trial brief pursuant to the Court's direction and respectfully states as follows:

## PRELIMINARY STATEMENT

1.      The Court directed the Committee to submit a brief regarding the merits of any avoidance action claims against certain insider recipients of prepetition payments related to the Bonus Programs (as defined below). The Debtors' insiders received approximately $28 million of such bonus, incentive and retention payments. The Debtors' liquidation analysis, disclosure statement, and expert reports on the Debtors' unencumbered assets do not recognize any potential recoveries on avoidance action claims against the Debtors' insiders.  These payments were not made in the ordinary course of business and are avoidable as preferential transfers or fraudulent transfers.[2]

---

[1]      The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are:  Legacy Reserves Inc. (9553); Legacy Reserves GP, LLC (1065); Legacy Reserves LP (1069); Legacy Reserves Finance Corporation (1181); Legacy Reserves Services LLC (2710); Legacy Reserves Operating LP (7259); Legacy Reserves Energy Services LLC (1233); Legacy Reserves Operating GP LLC (7209); Dew Gathering LLC (4482); Pinnacle Gas Treating LLC (3711); Legacy Reserves Marketing LLC (7593). The location of the Debtors' service address is: 303 W. Wall St., Suite 1800, Midland, TX 79701.

[2]      The payments may also constitute avoidable fraudulent transfers under Bankruptcy Code section 548(a)(1)(A) (providing for avoidability of transfers resulting from actual fraud) and the Texas Uniform Fraudulent Transfer Act.  *See* Texas Uniform Fraudulent Transfer Act Sections 24.005(a) (articulating elements of actual and constructively fraudulent transfers; stating that to determine whether transfer constitutes actual fraud, consideration may be given to whether the transfer was made to an insider) and 24.006 (stating that a transfer by a debtor is fraudulent as to a creditor whose claim arose before a transfer if the transfer was made to an insider "for an antecedent debt, the debtor was insolvent at that time, and the insider had reasonable cause to believe that the debtor was insolvent").

## BACKGROUND

2.       On June 18, 2019, the Debtors commenced their Chapter 11 cases (the "**Petition Date**").[3] On July 15, 2019, the Statements of Financial Affairs (the "**SOFA**")[4] were filed and disclosed that approximately $28.4MM in payments (below) were made to 12 insiders on account of 3 bonus programs: a Cash LTIP, a Retention Bonus Program, and other Bonus Plan (the "**Bonus Programs**").[5] $5.8MM in retention bonus payments were made 20 days prior to the Petition Date.

| Name | Position | Cash LTIP Vesting | Retention Bonus | Bonus | Total |
|------|----------|-------------------|-----------------|-------|-------|
| Paul Horne | Chairman Of The Board and Former CEO | $8.4 | -- | $0.6 | $9.0 |
| James Westcott | Director And Chief Executive Officer | 4.4 | 2.3 | 0.4 | 7.1 |
| Kyle Hammond | President and Chief Operating Officer | 3.7 | 1.5 | 0.2 | 5.4 |
| Kyle McGraw | Former Chief Development Officer | 2.7 | -- | -- | 2.7 |
| Micah Foster | Chief Accounting Officer and Controller | 0.8 | 0.3 | 0.1 | 1.2 |
| Dan Leroy | Former VP, General Counsel And Secretary | 1.0 | -- | -- | 1.0 |
| Robert Norris | Chief Financial Officer | -- | 0.8 | -- | 0.8 |
| Albert Ferrara | General Counsel And Corporate Secretary | -- | 0.5 | 0.2 | 0.7 |
| Cory Elliott | Chief Information Officer | -- | 0.3 | 0.1 | 0.4 |
| Travis McGraw | Brother of Kyle McGraw | 0.0 | -- | 0.0 | 0.1 |
| **Total** | | **$21.1** | **$5.8** | **$1.6** | **$28.4** |

## LEGAL STANDARD

**I.      The Insider Payments Are Avoidable
        Pursuant To Bankruptcy Code Section 548(a)(1)(B).**

3.       A transfer is constructively fraudulent under Bankruptcy Code section 548 when the debtor receives less than reasonably equivalent value in exchange for such transfer or obligation and incurred such obligation to or for the benefit of an insider, under an employment contract and not in the ordinary course of business.[6] The purpose of Bankruptcy Code section

---

[3]       The Debtors failed to mention the significant bonus payments in the Declaration of James Daniel Westcott in support of the Debtors' chapter 11 petitions and various first day motions. See Docket No. 3. Nor were any such payments disclosed by the Debtors to the Court at the first or second-day hearings.

[4]       See Docket No. 241, SOFA, attached hereto as **Exhibit A**.

[5]       See **Annex 1** for a description of the Debtors' Bonus Programs.

[6]       11 U.S.C. § 548(a)(1)(B). See In re TransTexas Gas Corp., 597 F.3d 298, 304 (5th Cir. 2010); In re HDD Rotary Sales, LLC, 499 B.R. 542, 548 (Bankr. S.D. Tex. 2013) (M. Isgur); In re Supplement Spot, LLC, 409 B.R.

548(a)(1)(B) is to "enhance the recovery of avoidable transfers and excessive prepetition compensation, such as bonuses, paid to insiders of a debtor."[7]

4.     The Debtors both incurred the obligation under the Bonus Programs and made the subject payments within two years of the Petition Date. The Debtors incurred such obligations to or for the benefit of insiders under various employment contracts.[8] The Debtors also received less than reasonably equivalent value in exchange for the obligations incurred.[9] Moreover, the Insider Payments were not made in the ordinary course of business.

5.     The term "ordinary course of business" is applicable to recurring, customary credit transactions that are incurred and paid in the ordinary course of business of both the debtor and the transferee.[10] "Courts hold that when a debtor transfers funds for the sole benefit of an insider, the transfer is not considered in the ordinary course of business."[11] The transfer must be

---

187, 199 (Bankr. S.D. Tex. 2009); In re Houston Drywall, Inc., No. 05-95161-H4-7, 2008 WL 2754526, at *31 (Bankr. S.D. Tex. July 10, 2008).

[7]     5 Collier On Bankruptcy ¶ 548.05[4] (16th ed. 2016). Sen. Durbin stated when proposing this new provision in 2005: "[M]y amendment would address fraudulent transfers made by corporate insiders, all those huge payouts and loans and bonuses and transactions that went to these corporate executives as the company was headed to bankruptcy." 151 Cong. Rec. SI979-01, 2005 WL 4977395, at *21-26 (Cong. Rec. 2005). See also  In re TSIC, Inc., 428 B.R. 103, 109-111 (Bankr. D. Del. 2010) (clear intent of Congress to eliminate excessive insider payments under employment contracts that prejudice general unsecured creditors).

[8]     **Exhibits B and C** - 2018 Omnibus Incentive Plan and related Employment Agreements.

[9]     Courts measure reasonably equivalent value by judging the consideration given for a transfer from the standpoint of creditors. See In re TransTexas Gas Corp., 597 F.3d at 306 (As the company was under financial distress, the debtor and the CEO executed a separation agreement, which superseded his employment agreement. The separation agreement provided the CEO $3 MM in installments, and he received $2,270,794.90 of it before the liquidating trustee brought suit attempting to claw back these payments. The Fifth Circuit easily found the former CEO to be an insider that received payments under an employment contract and then focused on the reasonably equivalent analysis. The Court stated, "the effect of [the former CEO's] severance payments was removing more than two million dollars from the debtor's estate, making the funds inaccessible to its creditors." TransTexas did not receive reasonably equivalent value for providing insider CEO greater compensation than required by the terms of the employment agreement); In re TSIC, Inc., 428 B.R. at 114 (severance package not reasonably equivalent value as it conferred benefits to insider CEO (who had a preexisting duty to serve as CEO) and not the estate.) Here, the net effect of the Insider Payments is removing more than $28MM away from the Debtors' estates, making the funds inaccessible to unsecured creditors. Thus, the estate has not received value reasonably equivalent to the payments transferred to insiders by the Debtors. See In re Cowin, No. 13-30984, 2014 WL 1168714, at *26 (Bankr. S.D. Tex. Mar. 21, 2014).

[10]     In re TSIC, Inc., 428 B.R. at 116 (severance payment made pursuant to a settlement agreement with a former executive "outside the ordinary course of Debtor's business because the severance payment is neither recurring nor customary.") (citation omitted).

[11]     Id. (severance was a transfer made to an "insider at a time when the Debtor suffered from severe financial distress, therefore making the payment extraordinary and avoidable.")

"recurring and customary" comporting with ordinary business terms used by similarly situated debtors and creditors faced with similar circumstances.[12] Payments made to an insider at a time when the Debtor is suffering from severe financial distress are "extraordinary and avoidable."[13]

6.      Here, the Debtors cannot meet their burden to show that the Insider Payments were made in the ordinary course of business. First, the payments were not recurring, customary transactions. The Insider Payments were made just prior to announcing a corporate reorganization. Second, payments made under the LTIP required approval by the former unitholders of Legacy LP, approval by the Compensation Committee, ratification by the Board of Directors, a special meeting, and the filing of an SEC Form 8-K.[14] Third, the Insider Payments deviate from the Debtors' customary practices under the longstanding March 15, 2006 incentive plan. Fourth, the retention bonuses were made pre-petition to avoid the scrutiny associated with such payments post-petition.[15] Finally, the payments were limited to insiders. The Insider Payments directly satisfy the plain language of the statute and the stated legislative history and thus should be avoided and recovered for the benefit of unsecured creditors.

## II.      The Insider Payments Are Avoidable Preferential Transfers Under Bankruptcy Code Section 547.

7.      The Estates can avoid these insider payments as preferences because they were payments on antecedent debts (purported bonus obligations awarded by the Board of Directors) made to insiders within a year of bankruptcy and the insiders received more than they would in a Chapter 7 liquidation.[16] Further, to the extent the Debtors are not presumed insolvent within the

---

[12]      Id.; In re Enron Creditors Recovery Corp., 376 B.R. 442, 459 (Bankr. S.D.N.Y. 2007).

[13]      In re TSIC, Inc., 428 B.R. at 116; see also In re Dearborn Bancorp, Inc., 583 B.R. 395, 407 (Bankr. E.D. Mich. 2018) (transfers under consulting agreement while debtor in transition and distressed not ordinary course).

[14]      See In re Montgomery Ward, LLC, 348 B.R. 662, 673 (Bankr. D. Del. 2006) ("ordinary course of business" protects "recurring, customary credit transactions").

[15]      See 11 U.S.C. 503(c)(2); In re Pilgrim's Pride Corp., 401 B.R. 229, 235 (Bankr. N.D. Tex. 2009).

[16]      See In re ContinentalAFA Dispensing Co., 451 B.R. 888, 892 (Bankr. E.D. Mo.2011) (stating that a creditor who receives a payment during the preference period will receive more than it would in a chapter 7

90 days prior to the Petition Date pursuant to Bankruptcy Code section 547(f), the Committee can establish the insolvency of the Debtors at all relevant times. Also, as discussed above, the Debtors fail under the ordinary course of business affirmative defense to the avoidance of the preferential transfers.[17]

## CONCLUSION

8.      For the reasons discussed herein, the Committee respectfully submits that the Debtors' estates hold valuable claims and causes of action against the Debtors' insider recipient of payments under the Bonus Programs.

---

liquidation unless unsecured creditors stand to receive a 100% payout in the case); In re Tusa-Expo Holdings, Inc., 811 F.3d 786, 792 (5th Cir. 2016) (applying analysis from In re El Paso Refinery, 171 F.3d 249, 253 (5th Cir.1999)).

[17]      The ordinary course affirmative defense fails. See also In re Tri-Union Dev. Corp., 349 B.R. 145, 147 (Bankr. S.D. Tex. 2006) (M. Isgur) (an otherwise preferential payment need not be returned to the debtor's estate if the transfer was: (A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee; (B) made in the ordinary course of business or financial affairs of the debtor and the transferee; and (C) made according to ordinary business terms); In re Gulf City Seafoods, 296 F.3d 363, 367 (5th Cir. 2002); In re SGSM Acquisition Co., 439 F.3d 233, 239 (5th Cir. 2006); In re Bison Bldg. Holdings, Inc., 473 B.R. 168, 177 (Bankr. S.D. Tex. 2012) (M. Isgur); In re HDD Rotary Sales, LLC, No. 11-38053, 2013 WL 1316750, at *4 (Bankr. S.D. Tex. Apr. 1, 2013) (M. Isgur). A creditor asserting the affirmative defense that a payment was in the ordinary course of business must prove all elements by a preponderance of the evidence. See In re Entringer Bakeries, Inc., 548 F.3d 344, 351 (5th Cir. 2008); In re Contractor Tech., Ltd., No. 05-37623, 2007 WL 4206211, at *2 (Bankr. S.D. Tex. Nov. 26, 2007) (M. Isgur). The transfers fail under the first prong because the debt was not incurred in the ordinary course of the parties' general business affairs. The second prong is subjective and typically requires consideration of: (1) the length of time the parties were engaged in transactions prior to the preference period; (2) whether the amount or form of tender differed from past practices; (3) whether the creditor engaged in any unusual collection or payment activities prior to the transfers; and (4) the circumstances under which the transfers were made. See 5 Collier On Bankruptcy ¶ 547.04[2][a][ii][B] (15th ed. rev. 2005); In re Tri-Union Dev. Corp., 349 B.R. at 147 (collecting cases); In re Louisiana Pellets, Inc., 605 B.R. 726, 731 (Bankr. W.D. La. 2019) ("[a] creditor must establish that the challenged transfer occurring during the preference period falls within the normal pattern of payment practices between the parties during the pre-preference period.") (citations omitted). The Debtors also fail under the second prong because due to, inter alia, the unusual circumstances surrounding the transaction and payment modality (large payment based on conversion from one entity type to another in order to mitigate financial distress). Finally, the Debtors fail under the last prong, as the transactions at issue are not consistent with normal payment practices. See In re SGSM Acquisition Co., LLC, 439 F.3d 233, 239 (5th Cir. 2006) (third prong is an objective element that compares credit arrangements between other similarly situated debtors and creditors in the industry to determine whether they are consistent with payment practices at issue); In re Ramba, Inc., 437 F.3d 457, 462 (5th Cir. 2006) (courts should consider whether a particular arrangement is so out of line with what others do that it fails to be ordinary); In re Gulf City Seafoods, 296 F.3d 363, 367 (5th Cir. 2002). The ordinary course defense is narrowly construed and a critical element in the analysis is whether the transactions between the debtor and the creditor before and during the ninety-day period are consistent. See Gasmark Ltd. Liquidating Tr. v. Louis Dreyfus Nat. Gas Corp., 158 F.3d at 317. Further, even if a transaction is the first such transaction undertaken by the parties, a court "should examine the conduct of the parties to determine whether either of them did anything unusual or extraordinary with respect to the transfer made in payment of the underlying debt." In re Tri-Union Dev. Corp., 349 B.R. at 150 (citations and quotation omitted). For these reasons, the transactions fail to be in the ordinary course of business and therefore is a voidable preference.

Dated: November 13, 2019
      Houston, Texas

Respectfully submitted,

By: /s/ *Hugh M. Ray, III*

**PILLSBURY WINTHROP SHAW PITTMAN LLP**
Hugh M. Ray, III (State Bar No. 24004246)
William J. Hotze (State Bar No. 24087754)
Two Houston Center
909 Fannin, Suite 2000
Houston, TX 77010-1028
Telephone: (713) 276-7600
Email: hugh.ray@pillsburylaw.com
      william.hotze@pillsburylaw.com

- and -

**BROWN RUDNICK LLP**
Robert J. Stark (admitted *pro hac vice*)
Bennett S. Silverberg (admitted *pro hac vice*)
Uchechi Egeonuigwe (admitted *pro hac vice*)
Seven Times Square
New York, NY 10036
Telephone: 212-209-4800
Email:   rstark@brownrudnick.com
bsilverberg@brownrudnick.com
uegeonuigwe@brownrudnick.com

-and -

Jeffrey L. Jonas (admitted *pro hac vice*)
James Stoll (admitted *pro hac vice* )
One Financial Center
Boston, MA 02111
Telephone: 617-856-8200
Email:   jjonas@brownrudnick.com

*Counsel for the Official Committee of Unsecured Creditors*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on November 13, 2019, a true and correct copy of the foregoing was served via email through the Bankruptcy Court's Electronic Case Filing System on the parties that have consented to such service.


/s/ *Hugh M. Ray, III*
Hugh. M. Ray, II

**<u>ANNEX I</u>**

| DEBTORS' BONUS PROGRAMS[1] | |
|---|---|
| **Cash Long Term Incentive Plan** | The Cash LTIP Vesting accounted for **$21.1MM** of the Bonus Payments, which the majority was provided to:<br><br>(i) Paul Horne, who was the chairman of the board of directors and former CEO, received **$8.4MM**;<br><br>(ii) James Westcott, who is the current director and CEO, received **$4.4MM**; and<br><br>(iii) Kyle Hammond, who is the current president and COO, received **$3.7MM**.<br><br>All of the Cash LTIP Vesting payments were distributed between **September 26, 2018 and December 31, 2018**. |
| **Retention Bonus Program** | The Retention Bonuses accounted for **$5.8MM**, as follows:<br><br>(i) James Westcott received **$2.3MM**,<br><br>(ii) Kyle Hammond received **$1.5MM**, and<br><br>(iii) the remaining senior executives (4) received **~$850K** or less.<br><br>Amounts include incentive payments and retention bonuses. The Retention Bonuses were related to: (i) **$3.7MM** for a 1-year retention Key Employee Retention Plan and (ii) **$2.1MM** for Q1 and Q2 2019 executive Key Employee Incentive Plan payments (1Q19 came in slightly below the quarterly target of $1.1MM).<br><br>The Retention Bonuses were all paid on **May 29, 2019**. |
| **Bonus Plan** | The Bonuses include FY18 incentive bonuses paid between **February 22, 2019 and March 1, 2019** for a total of **$1.6MM**. |

---

[1]     On March 23, 2018, the Board of Directors approved and adopted, subject to the consummation of the Corporate Reorganization and approval of the holders of Legacy units, the Legacy Reserves Inc. 2018 Omnibus Incentive Plan (the "**LTIP**") and certain grants under the LTIP to certain officers of the Company (the "**Initial Awards**"). On July 5, 2018, in connection with the approval of a merger agreement, the Board of Directors approved and adopted, subject to the consummation of the corporate reorganization and approval of the holders of Legacy units, a "Share Reserve" (as defined in the LTIP) of 10.5 MM shares. On September 19, 2018, the LTIP was approved by the former unitholders of Legacy LP in connection with the corporate reorganization for it and its affiliates' employees, consultants and directors. The LTIP and the Initial Awards became effective in connection with the consummation of the corporate reorganization and change of control. See Legacy Reserves, Inc. Form 10-K for the fiscal year ended December 31, 2018.